**PLAYBOY ENTERPRISES, INC., a Delaware corporation, Plaintiff,**

**v.**

**TERRI WELLES, INC., a California corporation, Steven Huntington, an individual, Terri Welles, an individual; Michael Mihalko, an individual; and PIPPI, Inc., a California Corporation, Defendant.**

**No. 98–CV–0413–K(JFS).**

United States District Court, S.D. California.

Dec. 1, 1999.

---

Craig E. Courter, Seltzer Caplan Wilkins and McMahon, San Diego, CA, Juani-

ta R. Brooks, McKenna and Cuneo, San Diego, CA, Clarke A. Wixon, Darby and Darby, Los Angeles, CA, David R. Francescani, Francescani and Hayes, Great Neck, NY, Anthony Michael Glassman, Glassman Browning and Saltsman, Beverly Hills, CA, for Plaintiff.

David J. Noonan, Post Kirby Noonan and Sweat, San Diego, CA, Michael J. Plonsker, Law Offices of Lavely and Singer, Los Angeles, CA, Jay S. Kopelowitz, Kopelowitz and Associates, San Diego, CA, for Defendant Terri Welles.

Darren James Quinn, Law Offices of Darren J. Quinn, San Diego, CA, for Defendant Michael Mihalko.

Dorothy Ann Johnson, Post Kirby Noonan and Sweat, San Diego, CA, for Defendant Pippi Inc.

Andrea J. Anz, Bottum and Feliton, Los Angeles, CA, Craig E. Courter, Seltzer Caplan Wilkins and McMahon, San Diego, CA, Juanita R. Brooks, McKenna and Cuneo, San Diego, CA, Anthony Michael Glassman Glassman Browning and Saltsman, Beverly Hills, CA, Dominic J. Fote, Chapman Glucksman and Dean, Los Angeles, CA, for Playboy Enterprises, Inc.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION

KEEP, District Judge.

On February 27, 1998, Plaintiff Playboy Enterprises, Inc. (PEI) filed a Complaint against Defendant Terri Welles.[1] The Complaint consists of five causes of action: 1) Count I, trademark infringement pursuant to 15 U.S.C. § 1114(1); 2) Count II, false designation of origin and unfair competition under 15 U.S.C. § 1125(a); 3) Count III, dilution of trademarks pursuant to 15 U.S.C. § 1125(c); 4) Count IV, trademark infringement and unfair competition under California common law; and 5) Count V, unfair competition in violation of Cal. Bus. & Prof.Code § 17200, *et seq*. On December 21, 1998, Plaintiff filed a first amended complaint adding Defendants Terri Welles, Inc., the current business corporation owned and operated by Ms. Welles, whose internet on-line service comprises Ms. Welles' business, and Stephen Huntington, the former webmaster of Ms. Welles' website who was responsible for developing and maintaining Ms. Welles' website prior to Defendant Mihalko's succession to the job as webmaster. On April 1, 1999, Plaintiff filed a Second Amended Complaint, supplementing the Complaint with three additional causes of action: 1) Count VI, a claim of trademark counterfeiting pursuant to 15 U.S.C. § 1114(1); 2) Count VII, a claim of dilution of trademark in violation of Cal. Bus. & Prof.Code § 14335; 3) Count VIII, a claim of breach of contract based on a document involving business relations between PEI, Pippi, Inc., and Terri Welles. In its Second Amended Complaint, Plaintiff also added two defendants: 1) Pippi, Inc., a defunct California corporation which allegedly contracted with PEI and Terri Welles; and 2)

---

**1.** On January 4, 1999, Defendant Terri Welles, as a corporation and an individual, filed a five count Counterclaim in the present action. In that Counterclaim, Defendant Welles claimed five causes of action: 1) defamation; 2) intentional interference with prospective business advantage; 3) intentional infliction of emotional distress; 4) unfair competition pursuant to California Business and Professions Code § 17200; 5) declaratory relief pursuant to California Business and Professions Code §§ 17203 and 17535. These claims were the subject of a summary judgment motion filed by Plaintiff on October 18, 1999 and set for hearing on November 15, 1999, contemporaneous with the hearing on the summary judgment motions filed with respect to Plaintiff's claims alleged in its Second Amended Complaint. However, in light of the complexity of the issues and the voluminous submissions by the parties in this case, the court will not address Plaintiff's summary judgment motion on the five counterclaims in this order. The court shall reserve the disposition of Plaintiff's summary judgment motion upon the counterclaims in a separate order.

Michael Mihalko, the current webmaster of Ms. Welles' website.

On October 18, 1999, Defendant Terri Welles, Terri Welles, Inc., and Pippi, Inc. (hereafter, "Defendant Welles" or "Welles") filed a motion for summary judgment or, in the alternative, for summary adjudication, of all eight of Plaintiff's claims against Defendants. Also on October 18, 1999, Defendant Michael Mihalko filed a motion for partial summary judgment, arguing that the "innocent infringer" defense under 15 U.S.C. § 1114(2) barred all Plaintiff's claims against him. Defendant Mihalko also filed a joinder in Defendant Welles' summary judgment motion. On October 18, 1999, Defendant Stephen Huntington filed a joinder in both Defendant Welles' and Defendant Mihalko's motions. On November 1, 1999, Plaintiff filed an opposition to Welles' motion for summary judgment or, in the alternative, for summary adjudication. In addition, Plaintiff filed an opposition to Defendant Mihalko's motion for partial summary judgment, objections to Defendant Mihalko's and Defendant Huntington's joinders, and evidentiary objections. On November 8, 1999, Defendant Welles filed a reply, and Defendant Mihalko filed a separate reply. Defendant Huntington did not file a reply.

## I. BACKGROUND

The following background facts are taken in large part from the court's April 22, 1998 order denying Plaintiff's motion for preliminary injunction:

Plaintiff Playboy Enterprises, Inc. (PEI) is an international publishing and entertainment company. Since 1953, PEI has published *Playboy* magazine, a widely popular magazine with approximately ten (10) million readers each month. PEI also publishes numerous specialty magazines such as *Playboy's Playmate Review*, *Playboy's Playmates of the Year*, and *Playboy's Calendar Playmates* among other publications. In addition to its publishing ventures, PEI produces television programming for cable and direct-to-home satellite transmission and sells and licenses various goods and services including videos.

PEI has established two websites. According to Plaintiff, its free website, http://www.playboy.com, has become one of the most popular sites on the Web and is used to promote its magazine, goods, and services. Its other website, called the "Playboy Cyber Club," http://www.cyber.playboy.com, is devoted to promoting current and former PEI models.

PEI owns federally registered trademarks for the terms *Playboy*, *Playmate*, *Playmate of the Month*, and *Playmate of the Year*. The term *Playmate of the Year* is sometimes abbreviated "PMOY." PEI does not have a federally registered trademark in the abbreviation "PMOY," although PEI argues that "PMOY" is worthy of trademark protection because it is a well-known abbreviation for the trademark *Playmate of the Year*.

Defendant Terri Welles is a self-employed model and spokesperson, who began her modeling career with *Playboy* magazine in 1980. In May of 1980, Ms. Welles appeared on the cover of *Playboy* magazine and was subsequently featured as the "Playmate of the Month" in the December 1980 issue. Ms. Welles received the "Playmate of the Year" award in June of 1981. Since 1980, Ms. Welles has appeared in no less than thirteen (13) issues of *Playboy* magazine and eighteen (18) newsstand specials published by PEI. Ms. Welles claims that since 1980 she has always referred to herself as a "Playmate" or "Playmate of the Year" with the knowledge of PEI.

On June 29, 1997, Ms. Welles opened a website, http://www.terriwelles.com, which includes photographs of herself and others (both nude and clothed), a fan club posting board, an autobiography section, and a listing of current events and personal appearances. The domain name for Defendant Welles' site is "terriwelles," the heading for the website is "Terri Welles— Playmate of the Year 1981," and the title of the link page is "Terri Welles—Playboy Playmate of the Year 1981." Each of the pages uses "PMOY '81" as a repeating

watermark in the background. According to Defendant, eleven (11) of the fifteen (15) free web pages include a disclaimer at the bottom of the pages, in varying font sizes depending on the page, which indicates that the website is not endorsed by PEI; the disclaimer reads as follows: "This site is neither endorsed, nor sponsored by, nor affiliated with Playboy Enterprises, Inc. PLAYBOY, PLAYMATE OF THE YEAR and PLAYMATE OF THE MONTH are registered trademarks of Playboy Enterprises, Inc." Defendant Welles uses the terms *Playboy* and *Playmate* along with other terms within the keywords section of the meta tags, which constitutes the internal index of the website used by some search engines. The site contains link pages to other erotic, adult-oriented websites. It also contains advertising "banners" for some of those websites.

Since May of 1997, Ms. Welles has been in contact with Plaintiff about the design and creation of her website. Defendant claims that Plaintiff, through Marcia Terrones, the director of the "Rights and Permission" department at PEI, informed her that she could identify herself as the "Playmate of the Year 1981" but that she could not reproduce the rabbit head logo on her proposed website. Various communications between Defendant and Plaintiff ensued. According to Defendant, PEI, through Hugh Hefner, initially complimented her website and encouraged her use of the title "Playmate of the Year 1981." However, Mr. Hefner later informed Defendant that use of PEI's trademarks were restricted; instead, he invited Defendant to join PEI's new Cyber Club. Defendant refused this invitation, and PEI continued to demand that Defendant remove the "Playmate of the Year" title from the home page as well as remove the PMOY watermark from the background.

## II. STANDARD OF LAW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Where the plaintiff bears the burden of proof at trial, summary judgment for defendant is appropriate if the defendant shows that there is an absence of evidence to support the plaintiff's claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Garneau v. City of Seattle,* 147 F.3d 802, 807 (9th Cir.1998). The movant has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmovant to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To make such a showing, the nonmovant must go beyond the pleadings to designate *specific facts* showing that there is a genuine issue for trial. *See id.* However, in considering this motion, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Courts should be careful not to let a motion for summary judgment become a "trial on affidavits." *Id.* Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate inferences are jury functions, not appropriate for resolution by the court in a motion for summary judgment. *See id.* at 255, 106 S.Ct. 2505.

Although the Ninth Circuit has stated that summary judgment is generally disfavored in trademark cases because of the inherently factual nature of most trademark disputes, *see Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1356 n. 5 (9th Cir.1985), summary judgment is nonetheless appropriate "where the party opposing the motion fails to demonstrate the existence of any material issues of fact for trial." *Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F.Supp. 949, 956 (C.D.Cal.1997), *aff'd,* 194 F.3d 980 (9th Cir. 1999) (affirming order granting defendant's motion for summary judgment).

The Ninth Circuit has recognized that *Levi Strauss* does not preclude the district court from determining likelihood of confusion as a matter of law, either through dismissal or summary judgment. *See Murray v. Cable National Broadcasting Co.*, 86 F.3d 858, 860–61 (9th Cir.1996).

Rule 56(a) and (b) provide for "summary adjudication of claims," also called "partial summary judgment." Partial summary judgment is appropriate when, using the standards outlined above, there is no genuine issue of material fact as to a particular claim. When there is no such issue of fact, the court may grant summary judgment in the party's favor "upon all or any part" of a claim. Rule 56(a), (b).

## III. DISCUSSION

### A. DEFENDANT TERRI WELLES, TERRI WELLES, INC., AND PIPPI, INC.

#### 1. *Counts I Through VII: Fair Use Defense*

Plaintiff alleges seven distinct trademark-related claims: 1) trademark infringement pursuant to 15 U.S.C. § 1114(1); 2) false designation of origin and unfair competition under 15 U.S.C. § 1125(a); 3) dilution of trademarks pursuant to 15 U.S.C. § 1125(c); 4) trademark infringement and unfair competition under California common law; 5) unfair competition in violation of Cal. Bus. & Prof.Code § 17200, *et seq.;* 6) trademark counterfeiting pursuant to 15 U.S.C. § 1114(1); and 7) dilution of trademark in violation of Cal. Bus. & Prof.Code § 14335. Defendant Welles asserts that she should be granted summary judgment on all seven claims[2] because there is no dispute of material fact that Ms. Welles uses the terms "Playboy" and "Playmate" in a non-trademark manner to describe her status as a recipient of titles bestowed upon her by Plaintiff and to describe the content of her website. In other words, Defendant Welles argues that because her use of the terms "Playboy"

and "Playmate" on her website is a "fair use" as a matter of law, she should be entitled to summary judgment as to all of Plaintiff's trademark-related claims against her.

█ A trademark is a "limited property right in a particular word, phrase, or symbol." *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir.1992). The purpose of a trademark is limited to the identification of the source of a good or service. *See id.* at 305. The "wrong protected against...[has been] traditionally equally limited: [p]reventing producers from free-riding on their rivals' marks" and capitalizing on their rivals' investment of time, money, and resources. *Id.* Where a trademark also describes a person, place, or an attribute of a product, however, the "policies of free competition and free use of language dictate that trademark law cannot forbid the commercial use of terms in their descriptive sense." 1 J. McCarthy, Trademarks and Unfair Competition, § 11.45, at 82 (1999). Thus, trademark law, as embodied in the Lanham Act, recognizes a "fair use" defense—the concept that a trademark registrant or holder cannot "appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *New Kids,* 971 F.2d at 306 (*quoting Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1185 (5th Cir.1980)).

█ Fair use is a defense to liability under the Lanham Act. *See* 15 U.S.C. §§ 1115(b)(4) and 1125(c)(4) (1999). The assertion by an alleged infringer that it is only using the contested term, mark, or designation at issue in a non-trademark, descriptive sense has become known as the "fair use" doctrine or defense. *See* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.45, at 80 (1999). Section 33(b)(4) of the Lanham Act codifies the fair use defense and states that the "right

---

2. Welles also argues that she should be granted summary judgment on the eighth count, breach of contract. The court will address

this argument in Section III(A)(3), *infra,* of this order.

to use the registered mark...shall be subject to the...defense[ ]...[t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark...of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b) and (b)(4) (1999). A common law fair use defense incorporates the statutory elements of the Lanham Act § 33(b)(4) so that if the defendant's use is a fair use as against an assertion of a registered trademark, then it is also fair use as against a state statutory or common law count. *See* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.49, at 93–94 (1999) (*citing Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984) and *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 789 (5th Cir.1983)).

■■■■ Section 33(b)(4) requires a defendant to prove three elements in order to establish a fair use defense:

1. Defendant's use of the term is not as a trademark or service mark.

2. Defendant uses the term "fairly and in good faith."

3. Defendant uses the term "*[o]nly* to describe" its goods or services.

1 J. McCarthy, Trademarks and Unfair Competition, § 11.49, at 94.1 (1999) (*quoting* 15 U.S.C. 1115(b)(4) (1999)).

Under element one, the only type of use which suffices as a "fair use" is use by a defendant of a term, mark, or symbol in a non-trademark sense. Under element two, a lack of good faith use may be inferred from: (1) a defendant's intentional breach of an agreement not to use the disputed mark; or (2) a defendant's use with the intent to "trade upon and dilute the good will" of a plaintiff's mark. *See* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.49, at 94.1 (1999) (*citing Institute for Scientific Information, Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002 (3d. Cir.1991), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991)). Finally, under element three, the statutory phrase "to describe the goods" is not restricted to words that describe a characteristic of the goods but rather the phrase can be applied to words that are descriptive in the broader sense. *See id.*

■■■■ Although Section 33(b)(4) makes no mention of a requirement that there be an absence of likelihood of confusion, the majority of courts, including the Ninth Circuit, have espoused the view that it is inconsistent to find both a likelihood of confusion and fair use. *See id.* at § 11.47, at 85–86. According to this reasoning, because the primary purpose of trademark law is to prevent likely confusion as to the origin, sponsor, or source of a mark, a showing of likely confusion bars a defendant's reliance on the fair use defense. *See Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985). Thus, in order to comply with the statutory requirement of § 33(b)(4) of the Lanham Act that "Defendant's use of the term is not as a trademark or service mark," 15 U.S.C. § 1115(b)(4) (1999), the Ninth Circuit has held that a defendant invoking the fair use defense must also establish that its fair use is not likely to cause confusion or did not "lead to customer confusion as to the source of the goods or services." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 366 (9th Cir.1990) (*citing Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir.1983)). The Ninth Circuit has articulated an eight-factor test, known as the *Sleekcraft* test, which the court may consider in determining the likelihood of confusion: 1) the strength of the mark; 2) proximity or relatedness of the goods; 3) similarity in appearance, sound, and meaning of the marks; 4) evidence of actual confusion; 5) degree to which the marketing channels converge; 6) type of good and degree of care customers are likely to exercise in purchasing them; 7) evidence of the intention of defendant in selecting and using the alleged infringing name; and 8) likelihood that the parties will expand their product lines.

*See AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 351 (9th Cir.1979).

■ Notwithstanding the Ninth Circuit's clear adoption of the view that a fair use cannot simultaneously be a confusing use, it recently decided in 1991 in the case of *New Kids on the Block v. News America Publishing, Inc.* that there is a *different* type of fair use that "lies outside the strictures of trademark law" because it "does not implicate the source-identification function." *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 308 (9th Cir.1992). The court in *New Kids* described this type of fair use as a "nominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service." *Id.* Under the *New Kids* standard, a court does not conduct the traditional analysis of likelihood of confusion promulgated in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 351 (9th Cir.1979) that is used in the "classic fair use case" but rather conducts a special three-pronged analysis for the new type of fair use defense entitled "a nominative fair use defense." *Id.* The court in *New Kids* was clear in asserting that the *New Kids* analysis only governs in special, atypical cases and that it did not "purport to alter the test applicable in the paradigmatic fair use case." *Id.* In deciding whether Defendant Welles is entitled to summary judgment on Plaintiff's trademark claims, the court will consider whether this case falls under the classic fair use case or the non-paradigmatic nominative fair use case; the court's analysis of this question and the issue of likelihood of confusion will be discussed *infra,* in section III(A)(1)(a)(1)(iii), of this order.

Plaintiff alleges that Ms. Welles cannot invoke the fair use defense because her use of Plaintiff's trademarks on her website (1) is a trademark use; (2) which creates a likelihood of confusion; and (3) which "goes farther than, or is out of proportion to, a fair description of PEI or Ms. Welles on the website." Plaintiff's Opposition, at 15. Plaintiff makes these allegations in regards to four specific uses by Defendant Welles on her website: (i) use of the Playmate term in the visual title or masthead for the website; (ii) use of the abbreviation, "PMOY '81," [3] as a repetitive, decorative watermark on pages throughout her site; (iii) use of the Playboy and Playmate terms in advertising banners on her site *and* in *other* websites to attract customers to click through to Welles' site; and (iv) use of the Playboy and Playmate terms in the HTML source code, including the HTML title, meta code description, and meta tag keywords. The HTML source code is the coding that is used for construction of a website's pages.

The court will address in turn each of these specific uses by Ms. Welles with respect to her invocation of the fair use defense.[4] Because Plaintiff's analyses in its opposition papers regarding the uses specified in (I), (ii), and (iii) in the above paragraph are intimately interconnected, the court will group together for discussion in the first section, section (a), the visible uses of PEI trademarked terms in the title or masthead, in the repeating watermarks, and in the advertising banners. In the

3. "PMOY" is an abbreviation for "Playmate of the Year." The word "PMOY" is neither registered under federal or state law as a trademark, although Plaintiff has applied for trademark protection of this abbreviation.

4. Plaintiff frames its trademark and trademark-related claims under a variety of statutory provisions and under the common law of California: §§ 32(1) and 43(a), 43(c)(1) of the Lanham Act for trademark infringement, counterfeiting, false designation of origin and unfair competition, and dilution; Cal. Bus. &

Prof.Code § 17200, *et seq.* for unfair competition, Cal. Bus. & Prof.Code § 14335 for claim of dilution of trademark; and California common law for trademark infringement and unfair competition. Notwithstanding the distinctions and nuances among these various statutory provisions and California common law, insofar as the fair use defense is applicable to each of these claims, the court's analysis of the fair use defense is identical for each of the seven trademark-related claims in sections III(A)(1)(a), (b), (c), and (d), *infra,* in this order.

second section, section (b), the court will address the issue of the use of PEI trademarked terms in the HTML source code, including the source title and the meta-tags.

### (a) *Visible Use of PEI Trademarked Terms: Title or Masthead, Watermarks, and Advertising Banners*

### (1) *Overview of Plaintiff's Allegations*

This section summarizes Plaintiff's allegations. In support of its allegations, Plaintiff relies solely on the appearance of the website or on its expert witness' (James Sterne's) opinions regarding the website. Following this summary, in section (2), is an analysis of the sufficiency of Plaintiff's allegations in light of Defendant's summary judgment motion.

### (I) *Title or Masthead*

The visual title at the top of Ms. Welles' website reads, "Terri Welles Playmate of the Year, 1981."[5] *See* Decl. of Cynthia Johnston, PEI Legal Department Staff, Ex. J. The name "Terri Welles" is in large, filled-in block letters, overlapping and dwarfing the designation, "Playmate of the Year, 1981." *See id.* The words, "Playmate of the Year, 1981," are in slender, cursive script letters. *See id.* From the court's color copy of the exhibit, it appears that all the words in "Terri Welles Playmate of the Year, 1981" are of similar coloring, but that the words, "Playmate of the Year, 1981," appear of a slightly light-

er shade than the words "Terri Welles" so that they are visible under the overlapping block letters of the name "Terri Welles." *See id.* Plaintiff argues that Ms. Welles' "prominent, stylized and memorable use of PEI's trademarks operates to...attract the attention of consumers to defendant's website," "borrow[s] from the cachet of the PEI marks," and "trade[s] off of the good will of those marks." Plaintiff further contends that Defendant Welles' trademark uses of the PEI marks are like "placing the marks on a sign above the entrance to a store, on the front of an advertising brochure, or on a product. They create source identification due to their context, prominence, location and stylization." Opposition, at 10 (*citing* Decl. of James Sterne ("Sterne Decl."), PEI Expert Witness, ¶¶ 7–9). Specifically, Plaintiff asserts, through its expert witness James Sterne and in its opposition briefs, that (1) Ms. Welles' site is a predominantly commercial site; (2) The visible title banner on the homepage is a prominent commercial use of the Playboy term; (3) The commercial theme is "Playboy Playmate of the Year"; (4) The visible use of the terms in the title banner and the subject headings[6] along the left-hand side of the homepage (along with the repeating PMOY[7] background watermark and the references in the HTML code and metatags) create a repetitive use of the Playboy and Playmate

**5.** Plaintiff raises in its Opposition the fact that at one point prior to Plaintiff's filing of its Complaint in this litigation, Ms. Welles had displayed as the visual title of her website, "Playboy Playmate of the Year 1981," with the word "Playboy" appearing in large bold letters. Opposition, at 7. Since these facts are not pleaded in either Plaintiff's First or Second Amended Complaint, the court need not address the issue whether Defendant Welles' use of the "Playboy" name in the visual title of her website as it existed prior to this litigation would constitute a non-trademark use unentitled to a fair use defense.

**6.** The subject headings Plaintiff refers to are the visible titles which appear alongside the left hand side of Ms. Welles' homepage. These titles are the "Directory"titles which describe the contents of web pages within Ms.

Welles' website and which allow the web user to link to the web pages corresponding to those subject titles. Plaintiff does not allege that these subject headings in themselves are a trademark use of PEI mark, *see* Opposition, at 6, but appears to allege, only in the declarations of its expert witness, that these subject headings, in combination of the other visible uses of PEI terms on the website, amount to a trademark use.

**7.** Although Mr. Sterne describes the watermark as only "PMOY," it is undisputed that Defendant Welles' watermark consists of "PMOY '81" and has always been so ("PMOY '81") since the website's inception in 1997. *See* Decl. of Cynthia Johnston, PEI Legal Department Staff, Ex. J, and ¶¶ 7–15; Defendant Welles' Reply, at 3.

terms; (5) Title banners or mastheads at the top of a commercial website do not serve the same function as book titles, but rather serve to identify the "source" of the website and its products; (6) This "source identification effect" is a result of the context of the use (commercial), prominence of the use (repetition and size), the location of the use (in title banner, source code, advertising banner, and wallpaper), and the stylization of the use (in script letters as product name and repetition of PMOY). *See* Sterne Decl., ¶¶ 8–11, at 4–5.

### (ii) *Watermarks*

Plaintiff alleges that Defendant Welles' repeating background watermark, "PMOY '81" is a trademark use. PMOY is an abbreviation for Plaintiff's federally-registered trademark, "Playmate of the Year." It is undisputed that the abbreviation PMOY is not a registered trademark under state or federal law, although Plaintiff's application for registration of the PMOY trademark, filed on April 5, 1999, is currently pending in the United States Trademark and Patent Office. However, since "[i]t is not necessary that a trademark be registered in order for it to qualify for protection under the Lanham Act," *Metro Publishing v. San Jose Mercury News*, 987 F.2d 637 (9th Cir.1993), and since Section 33(b)(4) also allows the elements of a fair use defense to be asserted against an allegation of infringement of an *unregistered* mark brought into federal court under § 43(a) of the Lanham Act, *see* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.49, at 93–94 (1999) (emphasis added) (citations omitted), the court shall treat its discussion of Welles' fair use of PEI's unregistered trademarked term "PMOY" in the watermarks in the same manner as its discussion of PEI's registered terms "Playboy," "Playmate," and "Playmate of the Year" in other areas of Ms. Welles' website.

The "PMOY" abbreviation is used as a watermark on the homepage as well as on the other pages throughout the website. Specifically, Plaintiff contends that "PMOY" appears on the web pages on which Ms. Welles solicits paid subscriptions to the "Members Only" portion of her website, sells pictures of herself, and solicits paid promotional appearances. *See* Opposition, at 7. According to Plaintiff, rather than being related to any editorial comment or description of Ms. Welles or PEI, these watermarks are a "repetitive, prominent, and plainly commercial use of PEI's marks to identify defendant's business, goods, and services." *Id.*

### (iii) *Advertising Banners*

Ms. Welles has created special advertising banners for her website: rectangular-shaped boxes which contain a photograph of Ms. Welles, the name "Terri Welles," and a designation that uses the term "Playmate" and/or "Playboy." There are two forms of the advertising banners; both contain a semi-nude photograph of Ms. Welles, and the title or name of the website. *See id.* One of the titles states, "Terri Welles Playboy Playmate of the Year '81," and the other states, "Playmate of the Year 1981 Terri Welles." *See id.* at Ex. D. In both of the banners, "Terri Welles" appears in script letters of a different coloring and of a larger size than the corresponding descriptors, "Playboy Playmate of the Year '81" and "Playmate of the Year 1981." *See id.* at Ex. D. These banners can be "borrowed" and "cut and pasted" by other website owners from her website to other websites. This process is accomplished by a user clicking on the banner on Ms. Welles' website and copying and transporting the underlying source code [8] to the third party website. *See* Opposition, at 7.

Plaintiff makes several contentions regarding the use of the advertising banners: (1) Anyone can "grab" these banners from defendant's website, and by doing so, include PEI's trademarks on the face of

---

**8.** A thorough discussion of the Internet and the underlying source code occurs in Section III(A)(1)(b), *infra,* of this order.

their website and in the source code; (2) Defendant's motivation for these banners is to attract click through traffic from other adult websites and increase her ranking among search engines that rank, in part, on the basis of a number of links to a website; and (3) An internet user who clicks through to defendant's website by clicking on the advertising banner on a third party website will likely know nothing about Ms. Welles' site other than the references on the banner—adult entertainment, the PEI trademark, and Ms. Welles' identification as a Playmate. *See* Opposition, at 7–8.

### (2) *Analysis*

Since Defendant Welles' is the movant on the motion for summary judgment, she bears the burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress and Co.*, 398 U.S. at 157, 90 S.Ct. 1598. And since Welles asserts an affirmative defense of fair use, she bears the burden of establishing sufficient facts to support a finding in her favor. *See Tiffany Design, Inc. v. Reno–Tahoe Specialty, Inc.*, 55 F.Supp.2d 1113, 1122 (D.Nev.1999) (*citing Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.1997), *cert. denied,* 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997) and *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994)). If Defendant Welles meets this initial burden of demonstrating sufficient facts entitling her to a fair use defense, the burden then shifts to PEI to show that there is a genuine dispute of a material fact. *See Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. In order to meet this burden, PEI must go beyond the conclusory allegations in its complaint and must designate *specific facts* showing there is a dispute as to a material issue for trial. *See id.*

The court finds that on the papers submitted to it on the summary judgment motion, Defendant Welles has met her burden in establishing sufficient facts to support a finding that she is entitled to a fair use defense. That is, Ms. Welles has shown that under the Lanham Act

§ 33(b)(4), Ms. Welles' use of PEI trademarked terms in her website is a non-trademark use, "which is descriptive of and used fairly and in good faith only to describe [her] goods or services." 15 U.S.C. 1115(b)(4) (1999). Although Plaintiff makes blanket allegations, in its Opposition and through the declaration of its expert witness, James Sterne, that the "prominence and placement" and the "stylized," "repetitive," and "memorable" use of the contested terms "Playboy" and "Playmate" evidence an intent to "borrow from the cachet of the PEI marks," and "trade off of PEI's goodwill of the marks," Opposition, at 9 and 14, upon a clearer examination of the facts supporting these allegations, the court finds that Plaintiff does not raise a material issue of fact with regards to the three elements of the fair use defense in the Lanham Act § 33(b)(4). In sum, the court finds that Defendant's use of the terms is used (1) "only to describe the goods or services of such party;" (2) "fairly and in good faith;" and (3) "otherwise than as a trademark." 15 U.S.C. § 1115(b)(4) (1999)). Accordingly, summary judgment for Defendant is proper as to Plaintiff's trademark and unfair competition claims.

### (i) *Only To Describe the Goods or Services*

 There is no dispute as to the fact that the phrase "Playmate of the Year 1981" is descriptive of Ms. Welles and her on-line services in the sense that the title actually describes the product(s) being sold. Terri Welles was and is the "Playmate of the Year for 1981"—Plaintiff has conceded this fact. It was a title earned by and bestowed upon Ms. Welles as a Playboy model, a title which has become part of her identity and adds value and "prestige" to her name. Hugh Hefner, the owner and president of PEI, stated that becoming a Playboy Playmate was certainly "the first stepping stone" in establishing some women's fame and that the advantages of a woman becoming a Playmate are "celebrity, first and foremost." *See*

Decl. of David Noonan, Defendant Welles' Counsel, Ex. 1 ("Deposition of Hugh Hefner") (hereafter, "Hefner Deposition"), at 7–8, 43. Furthermore, Mr. Hefner has admitted that PEI "has always encouraged Playmates or Playmates of the Year to use their fame to promote themselves or make a living in connection with television...radio..[a]nd movies." *Id.* at 54–55. Therefore, it is undisputed that the "Playmate" title of a Playmate model is a designation that either has, or is intended to have, public recognition.

Ms. Welles earned the title of "Playboy Playmate of the Year" in 1981 and has used that title ever since, without objection from PEI—until the inception of this lawsuit. Although it is undeniable that the term "Playboy" and "Playmate" are suggestive trademarks in which Plaintiff has a vested property right as the senior user, it is equally indisputable that the title has become part of Ms. Welles' identity to the public, in much the same way as her name identifies her to others. Not surprisingly, it has been noted that the fair use defense is founded upon the same principles as the defense of the right to use one's own personal name. *See* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.45, at 81 (1999). The concept that there should be some qualified right to use one's own name as a mark has resulted in a great reluctance of judges to issue an absolute injunction against any use, even trademark use, of a personal name mark. *See id.* at § 13.9, at 17. Courts have generally refused to "wholly forbid a man to do business in his own name" since "[t]o prevent all use of it [personal name] is to take away his identity; without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can." *Id.* at § 13.9, at 17 (citations omitted). As the Ninth Circuit stated in *New Kids*, "sometimes there is no descriptive substitute...For example, one might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be

understood) to refer to the Chicago Bulls." 971 F.2d at 306. Likewise, given that Ms. Welles is the "Playmate of the Year 1981," there is no other way that Ms. Welles can identify or describe herself and her services without venturing into absurd descriptive phrases. To describe herself as the "nude model selected by Mr. Hefner's magazine as its number-one prototypical woman for the year 1981" would be impractical as well as ineffectual in identifying Terri Welles to the public. This is especially true since, as Mr. Hefner has admitted, "most people around the world that are familiar with Playboy magazine would refer to these women as Playmates." Hefner Deposition, pp. 43–44. In such a case as this, use of the trademarks, "Playmate of the Year 1981," "Playboy Playmate of the Year 1981," and "PMOY '81," is purely *nominative* and "does not imply sponsorship or endorsement of the product because the marks are used only to describe the thing, rather than to identify its source." *Id.* Accordingly, the court finds that the use of the terms "Playmate of the Year 1981," "Playboy Playmate of the Year 1981," and "PMOY '81" in the visible portions of Defendant Welles' website is descriptive of Ms. Welles; it is her services and goods being described, and the public identifies her by the titles bestowed upon her by PEI.

### (ii) *Used Fairly and in Good Faith*

 Plaintiff correctly points out that bad faith can be inferred from evidence of an intent to "trade upon and dilute the good will" of a defendant's mark. *See Institute for Scientific Information, Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002 (3d. Cir.1991), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991)). Although Plaintiff implies that Ms. Welles is acting in bad faith when it asserts that she used its trademarked terms with the intent to "trade off of the good will" of PEI's marks, Opposition at 9, the court finds that Plaintiff has failed to identify any conduct of Ms. Welles that is sufficiently blamewor-

thy. For example, Plaintiff has failed to state any facts which indicate that Ms. Welles' use of the PEI trademarked terms was improperly motivated. *Cf. Marcus v. Rowley, et al.,* 695 F.2d 1171, 1175 (9th Cir.1983) (in copyright infringement case, since fair use presupposes that the defendant has acted fairly and in good faith, the propriety of the defendant's conduct should also be weighed in analyzing the purpose and character of the use). Insofar as Plaintiff alleges that Defendant Welles' failure to seek written permission from PEI prior to her website use of PEI trademarked terms was evidence of bad faith, the court rejects this argument. The Supreme Court stated in *Campbell v. Acuff–Rose Music, Inc.* that being denied permission to use a work does not weigh against a finding of good faith fair use. *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 585, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (*citing Fisher v. Dees,* 794 F.2d 432, 437 (9th Cir.1986) The Supreme Court elaborated, "[W]e reject [plaintiff's] argument that [defendant's] request for permission to use the original should be weighed against a finding of fair use . . . [The defendant's] actions do not necessarily suggest that they believed their version was not fair use; the offer may simply have been made in a good-faith effort to avoid this litigation. If the use is otherwise fair, then no permission need be sought or granted." *Id.* at 585, n. 18, 114 S.Ct. 1164.

Contrary to Plaintiff's unsupported allegations of bad faith, Ms. Welles provides uncontroverted evidence that she sought to take precautions to ensure that her use of PEI's trademarked terms in her website was permitted by PEI. *See* Decl. of Terri Welles, ¶¶ 8–9, 17 and Exs. 2, 9–10. For example, in an effort to "avoid threatened litigation," Ms. Welles has removed some references per Plaintiff's request and made changes to her website consisting of: (1) adding disclaimers to the bottom of most pages of her website; [9] (2) including a hyperlink from her website to www.playboy.com; (3) substituting the visual title of "Playboy Playmate of the Year 1981" to "Terri Welles, Playmate of the Year, 1981;" (4) removing the images of three Playboy covers; (5) removing any image which PEI contended was a PEI-copyrighted image. *See id.* at ¶¶ 19–20. Furthermore, it is undisputed that she does not use "Playboy" or "Playmate" in her domain name, she does not use in the "Playmate of the Year 1981" title a font recognizable as a Playboy magazine font, and she does not use the classic Playboy bunny logo. These factors indicate that Plaintiff has not intended to "misle[a]d or confuse[ ] [the consumer] as to the source of the different products or services." *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1329 (8th Cir.1984) (holding that "the essential question in any case of alleged trademark infringement is whether purchasers are likely to be misled or confused as to the source of the different products or services"). Finally, the unavailability of other phrases to accurately describe Ms. Welles and her business bolsters the court's finding of good faith. *See Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984) (choice of the phrase "HiRes Adventure" when other phrases were available could indicate bad faith) (citations omitted). Therefore, the court finds that Ms. Welles has established sufficient evidence to show that under the Lanham Act § 33(b)(4), PEI's trademarked terms in her visible website are "used fairly and *in good faith* only to describe [her] goods or services." 15 U.S.C. § 1115(b)(4) (1999) (emphasis added).

### (iii) *"Otherwise Than as a Mark"*

The bulwark of Plaintiff's arguments are concentrated on this prong of the fair use defense: whether Ms. Welles' use of PEI terms is "otherwise than as a mark." The governing law in the Ninth Circuit is that

---

**9.** These disclaimers clearly state that the website is not endorsed by PEI. *See Consumers Union of U.S. v. General Signal Corp.,* 724 F.2d 1044, 1053 (2d Cir.1983) ("Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship.").

in order to constitute a non-trademark, "fair use," the use cannot amount to a trademark infringement or unfair competition. *See Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1248 (9th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985). The keystone of whether a use constitutes trademark infringement or unfair competition is the avoidance of a likelihood of confusion in the minds of the buying public. *See id.* at 1243; *see also* 1 J. McCarthy, Trademarks and Unfair Competition, § 2.8, at 15 (1999). Thus, the dispositive issue in deciding whether there is a genuine dispute of material fact as to Ms. Welles's non-trademark use of PEI trademarked terms in her website is the likelihood of confusion.

The Ninth Circuit has articulated an eight-factor test, known as the *Sleekcraft* test, which the court may consider in determining the likelihood of confusion: 1) the strength of the mark; 2) proximity or relatedness of the goods; 3) similarity in appearance, sound, and meaning of the marks; 4) evidence of actual confusion; 5) degree to which the marketing channels converge; 6) type of good and degree of care customers are likely to exercise in purchasing them; 7) evidence of the intention of defendant in selecting and using the alleged infringing name; and 8) likelihood that the parties will expand their product lines. *See AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 351 (9th Cir.1979). A party need not establish the existence of all eight factors in its favor in order to prevail on a finding of a likelihood of confusion (or lack thereof) since these factors are simply helpful guidelines for the determination of potential customer confusion, and no one factor is dispositive in every case. *See Metro Pub. Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993). Additionally, although some factors will be much more significant than others, and the relative importance of each factor will be case-dependent, "it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Com-munications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999).

 Although Plaintiff offered as part of its evidence of likelihood of confusion its expert witness' opinion that there is a "likelihood of confusion," *see* Sterne Decl., ¶¶ 11, 13, 15, and 16, at 5–6, the court cannot rely on any of Plaintiff's expert witness' James Sterne's *ultimate conclusions* regarding whether there was a likelihood of confusion. Plaintiff's expert, James Sterne, makes the conclusory allegation that Defendant Welles' repetitive use of the contested terms throughout her website, "[i]nstead of being merely descriptive of her background... create[s] a commercial 'theme' for the website," and thus the "repetitive use of the Playboy marks will create confusion among a significant number of users regarding PEI's endorsement of or affiliation with the Welles Site." Sterne Decl., ¶¶ 9 and 11, at 5. In assessing whether there is a likelihood of confusion, this court first must consider the *Sleekcraft* factors and *then* determine whether there exists a likelihood of confusion. *See Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 443 (9th Cir.1980). With the analysis so structured, the determination of what is the state of affairs regarding each factor (a "foundational fact") is a finding of fact, *but the further determination of likelihood of confusion based on those factors is a legal conclusion. See id.,* 616 F.2d at 443 (emphasis added) (*citing J.B. Williams Co., Inc. v. Le Conte Cosmetics, Inc.,* 523 F.2d 187, 191–92 (9th Cir.1975) and *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–54 (9th Cir. 1979).) Federal Rules of Evidence 704 was not intended to allow experts to offer opinions embodying legal conclusions. *See United States v. Scop,* 846 F.2d 135, 139 (2d Cir.1988). Thus, Mr. Sterne's conclusion that Ms. Welles' use "create[s] confusion among a significant number of users regarding PEI's endorsement of or affiliation with the Welles Site," Sterne Decl.,

¶¶ 9 and 11, at 5, renders a *legal opinion* which the court will not entitle any weight. Additionally, insofar as Mr. Sterne's conclusory statements render legal opinions regarding whether Ms. Welles' use of the contested terms is a "descriptive" or "fair use," or constitutes use as "Playboy [trade-]marks," Sterne Decl., ¶¶ 9 and 11, at 5, the court likewise will not entitle them any weight. *See United States v. Scop*, 846 F.2d 135, 139 (2d Cir.1988) (holding that Fed.R. Evid. 704 was not intended to allow experts to offer opinions embodying legal conclusions). Expert testimony consisting of legal conclusions regarding the "likelihood of confusion" or Ms. Welles' "fair" or "descriptive" use are inappropriate subjects for expert testimony and as such, are inadmissible. *See Aguilar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir.1992). However, for purposes of the motion for summary judgment, the court assumes as true the facts and opinions of Mr. Sterne (which are based upon his expertise) which are alleged in his declaration and from which he renders these conclusory statements.[10] With respect to the foundational facts, Mr. Sterne's opinions are believed and "all justifiable inferences...[are] drawn in his...favor," *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 255, 106 S.Ct. 2505, as long as Mr. Sterne goes beyond the pleadings to allege *specific* facts regarding "the state of affairs regarding each [*Sleekcraft* ] factor," *Alpha Industries, Inc.*, 616 F.2d at 443, rather than merely assert a conclusory statement. *See Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. In other words, the court will assume as true Mr. Sterne's expert opinion on what is the state of affairs regarding each *Sleekcraft* factor, but the court will *not* allow Mr. Sterne to render a legal opinion on whether, based on all the *Sleekcraft* factors, there is a likelihood of confusion.

■ Applying the *Sleekcraft* test, the court finds that the totality of the *Sleekcraft* factors does not compel a finding of a likelihood of confusion. Plaintiff's mark is strong, the goods are related (online erotica), and the marketing channels (internet) converge. However, since the goods are related (online erotica), and the marketing channels (internet) converge, it is unnecessary to consider the eighth factor, whether the parties will expand their product lines so that there is even more competition; the fact that Plaintiff and Defendant Welles are in competition is not disputed. As for the sixth factor, the type of good and degree of care customers are likely to exercise in purchasing the goods, Plaintiff's expert states, without factual support, that "Internet users are easily frustrated," and "given the relatively inexpensive nature of these [on-line erotica] products, the degree of care one would expect consumers" to have "is low." Sterne Decl., ¶¶ 15, 18, at 6–7. The court will assume without deciding that Plaintiff's expert's opinion is to be believed and that his opinion falls within his field of expertise in internet marketing. However, the court finds that the remaining three factors militate strongly in Defendant's favor: similarity in appearance, sound,[11] and meaning of the marks, evidence of actual confusion, and evidence of the intention of defendant in selecting and using the alleged infringing name. As discussed *infra* in this section of the court's order, Ms. Welles' use of the trademarked terms and PEI's use of the trademark are certainly dissimilar in "appearance"of the marks: Ms. Welles does not use the PEI bunny logo, the PEI bunny theme, PEI trademark fonts, PEI trademark dress, or PEI trademark colors. Ms. Welles' use and PEI's use differ in meaning: Ms. Welles uses the contested terms in a non-trademark manner to de-

---

10. For purposes of deciding the motion for summary judgment, the court will assume, without deciding, that Mr. Sterne is an expert in the field of marketing and consumer behavior and is qualified to render expert opinion testimony under the Federal Rules of Evidence 702, 703, 704, and 705.

11. Since neither party discusses the sound of the contested terms, and since the terms are viewed on a web page rather than spoken, the court need not consider this aspect of the *Sleekcraft* factor.

scribe herself and *not* to identify PEI as the source, sponsor, or affiliate of her goods; PEI's use is in a trademark manner to identify itself as the source of the goods. Therefore, the court finds that there is no "similarity in appearance...and meaning of the marks." The court's finding of dissimilarity under this *Sleekcraft* prong is not inconsistent with the fact that the words themselves used in Ms. Welles' website are identical to the words in PEI's trademarks. As the court explained in *Lindy Pen*, the "two marks viewed in isolation are indeed identical, but their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the [products]." *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d at 1245.

Plaintiff presents no "evidence of actual confusion," and the court is unaware of any evidence of actual confusion. In spite of Plaintiff's and Plaintiff's expert witness' conclusory allegations that consumers are likely to be confused, *PEI has presented no facts from which the court can infer that consumers have been confused or are likely to be confused.* Plaintiff has presented no empirical evidence (either anecdotal or survey) to show that there is actual confusion among consumers. Plaintiff's expert admits that there is no such evidence of which he is aware. *See* Reply Decl. of David J. Noonan, Ex. 2 ("Deposition of James Sterne—Volume I") ("Sterne Deposition"), at 117–118. The factors, e.g., prominence, repetition, location, and stylization, Plaintiff and Plaintiff's expert cite as causing consumer confusion as to the source or association of Ms. Welles' use of the contested terms will be discussed in more detail *infra* in this section. At this point, the court merely notes that for reasons discussed later, the court rejects Plaintiff's conclusions with respect to the factors of prominence, repetition, location, and stylization and holds that these factors as presented fail to raise a material issue of fact concerning Ms. Welles' fair use. Although actual confusion is not essential to a finding of infringement, a mere possi-

bility is not enough: "There must be a *substantial* likelihood that the public will be confused." *WSM, Inc. v. Hilton,* 724 F.2d at 1329 (emphasis added); *see also Murray v. Cable National Broadcasting Co.,* 86 F.3d at 860–61 (confusion must be probable, not merely a possibility). The court finds that Plaintiff has failed to produce facts from which a "*substantial* likelihood that the public will be confused" can be inferred.

With respect to the "evidence of the intention of defendant in selecting and using the alleged infringing name" prong, the evidence weighs heavily in Ms. Welles' favor. As previously discussed in this order, there is an absence of evidence that Ms. Welles has acted in bad faith in her selection of PEI's trademarked terms in her website; on the contrary, there exists considerable evidence that Ms. Welles' acted in good faith and that her use was fair and not misleading. To summarize, Ms. Welles provides evidence that she sought to take precautions to ensure that her use of PEI's trademarked terms in her website was permitted by PEI, Ms. Welles has removed some references per Plaintiff's request and made changes to her website in order to placate some of Plaintiff's concerns, she does not use "Playboy" or "Playmate" in her domain name, she does not use in the "Playmate of the Year 1981" title a font recognizable as a Playboy magazine font, she does not use the classic Playboy bunny logo, and realistically, she is unable to identify herself as "Playmate of the Year" without using the title that PEI bestowed upon her. Thus, the court finds that notwithstanding Ms. Welles' selection and use of the contested PEI terms in the visible portion of her website, there is no evidence of bad faith or intent to infringe. And as this court has explained, Ms. Welles is the Playmate of the Year for 1981. Her celebrity status sprang from her repeated selections as a Playboy model. Her public persona is based on these titles, and although she uses these titles, these titles fairly and accurately describe her.

In short, the court's consideration of the factors in *Sleekcraft* affirms its finding with regards to Ms. Welles' fair-and-in-good-faith, nominative use of the PEI trademarked terms in the visible portion of her website. The court finds that Plaintiff has failed to present any facts to show a genuine issue as to the likelihood of confusion under *Sleekcraft*. *See, e.g., Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d at 1246 (affirming district court's finding of absence of likelihood of confusion based on factors of weakness of mark, dissimilarity, lack of actual confusion, and lack of bad faith).

*Other Unnamed Variables Under the Sleekcraft Test*

In its attempt to make a showing of likelihood of confusion, Plaintiff largely relies on its expert witness, James Sterne, to satisfy its burden that Ms. Welles' use of the contested terms is a use otherwise than as a trademark. The following discussion of the factors of location, commercial context, stylization, lettering, repetition, commercial theme, and prominence cannot neatly be categorized as an analysis of one, particular *Sleekcraft* factor, but arguably falls under the rubric of three *Sleekcraft* factors: similarity in appearance, sound, and meaning of the marks, degree to which the marketing channels converge, and evidence of the intention of defendant in selecting and using the alleged infringing name. The court need not decide whether its discussion of the factors of location, commercial context, stylization, lettering, repetition, commercial theme, and prominence strictly falls under the *Sleekcraft* eight-factor test. The Ninth Circuit has stated that the *Sleekcraft* test is a pliant one. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d at 1053. In other words, "the foregoing list [of eight factors] does not purport to be exhaustive, and non-listed variables may often be quite important." *Id.*

With the pliant nature of the analysis of likelihood of confusion under *Sleekcraft* in mind, the court turns to a discussion of the factors enumerated by Plaintiff's expert witness as contributing to a likelihood of confusion regarding Ms. Welles' use of PEI trademarked terms. According to his declaration, Mr. Sterne has extensive experience in the field of marketing, both in relation to the Internet and to non-Internet forms. *See* Sterne Decl., ¶ 2. As discussed briefly in section III(A)(1)(a)(1)(I), *supra*, of this order, Plaintiff's main "facts" supporting its allegations that Ms. Welles' "prominent, stylized and memorable use of PEI's trademarks operates to . . . attract the attention of consumers to defendant's website," "borrow[s] from the cachet of the PEI marks," and "trade[s] off of the good will of those marks," Opposition at 9, are as follows:

(1) Ms. Welles' site is a predominantly commercial site; (2) The visible title banner on the homepage is a prominent commercial use of the Playboy term; (3) The commercial theme is "Playboy Playmate of the Year"; (4) The visible use of the terms in the title banner and the subject headings along the left-hand side of the homepage (along with the repeating PMOY background watermark and the references in the HTML code and metatags) create a repetitive use of the Playboy and Playmate terms; (5) Title banners or mastheads at the top of a commercial website do not serve the same function as book titles, but rather serve to identify the "source" of the website and its products; (6) This "source identification effect" is a result of the context of the use (commercial), prominence of the use (repetition and size), the location of the use (in title banner, source code, advertising banner, and wallpaper), and the stylization of the use (in script letters as product name and repetition of PMOY). *See* Decl. of James Sterne, PEI Expert Witness, ¶¶ 8–11, at 4–5.

In short, Plaintiff's expert contends that the prominence, location, stylization, and repetition of Ms. Welles' use of PEI terms in a commercial context creates a likeli-

hood of confusion as to the source of the goods.

### 1) *Location and Commercial Context*

That Ms. Welles' site—and her use of the contested terms—are predominantly commercial is not contested. That the title or masthead is located at the top of the homepage and serves to identify the source of the website and its products is not disputed: Defendant Welles does not contest the location of the title or the fact that the visual title, "Terri Welles Playmate of the Year 1981," is meant to identify the source of her products and of her website. Neither does Ms. Welles dispute the location of the advertising banners (or the words contained therein) and that the words on both forms of the banner serve to identify the name or title of her website, or the "source" of her goods. The parties also do not dispute the location of the "PMOY '81" abbreviation used as watermarks on specific web pages. Even accepting as true Mr. Sterne's other assessments that the title and "PMOY '81" watermarks are "prominent" and appear "in script letters as [a] product name," and the combined repetitive use of the contested terms throughout the website create a "commercial theme" of "Playboy Playmate of the Year," this court holds that these facts, in combination with the factors of location (as a "sign above the entrance to a store") and of commercial use of the PEI terms, do not rebut Defendant Welles' showing that she has made a non-trademark use of the terms "Playboy Playmate of the Year 1981," "Playmate of the Year 1981," and "PMOY '81" in good faith merely to describe *her* products and services.

### 2) *Stylization and Lettering*

The fact that the font of the Playmate of the Year 1981 title is not recognizable as a Playboy magazine font evidences a reasonable use of the term and an absence of an intent to trick or mislead customers into implying sponsorship or endorsement by Plaintiff. *See Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969). The words "Terri Welles" are in *block* letters which overlap and partially cover the words, "Playmate of the Year 1981," which are in cursive *script* letters, in smaller size. *See* Decl. of Cynthia Johnston, PEI Legal Department Staff, Ex. J. It is undisputed that the title trademark for "Playboy" magazine is in *block,* not script letters. *See* Decl. of Martha Lindeman, PEI Senior Vice–President of Investor Relations and Corporate Communications, Ex. D; Second Amended Complaint, Ex. C, at 37. Plaintiff indicates nothing in particular about the stylization and lettering (size, coloring, font, etc.) of the "Playmate" term in the visual title, the "Playboy" and "Playmate" terms in the advertising banners, and the term "PMOY '81" in the watermarks which are either an imitation of PEI's trademark style or dress or an attempt to invoke the imagery—directly or indirectly—of PEI's well-recognized bunny logo. *See Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969) ("Church did not use Volkswagen's distinctive lettering style or color scheme, nor did he display the encircled 'VW' emblem."). Rather, the undisputed facts indicate that Ms. Welles' use of PEI terms do not match PEI's use of its trademark in style, dress, or other manner. Also, it is undisputed that (1) the lettering of the name "Terri Welles" as it appears in the visual title of her homepage and in the advertising banners is *larger* than the lettering of the designation, "Playmate of the Year 1981" or "Playboy Playmate of the Year 1981" and (2) the picture of the *solo* Terri Welles appears on the homepage and in the advertising banners. Thus, despite Mr. Sterne's unsupported conclusions, there are no disputed facts that Ms. Welles' stylization and lettering of PEI terms in her website do not create a likelihood of confusion as to the source of the goods: Terri Welles.

Upon similar facts in the case of *Cosmetically Sealed Industries, Inc. v. Chesebrough–Pond's USA Co.,* the Second Circuit affirmed summary judgment and

found that the defendant's use of the challenged trademarked terms was not a trademark infringement, but fair use. *Cosmetically Sealed*, 125 F.3d at 29–30. The court in *Cosmetically Sealed* noted that the defendant's product name, "Color Splash," and its own trademark, "Cutex," appeared in the center and top-center of the promotional display card in red *block* letters at least twice or three times the size of the lettering for the challenged phrase, "Seal it with a Kiss!!," which was in *script* type. *See id.* (emphasis added). The *Cosmetically Sealed* court held that "the non-trademark use of the challenged phrase and the defendant's good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of defendant's own trademarks." *Id.* at 30. Likewise, the court here finds that Ms. Welles' use of PEI's terms in a style dissimilar to PEI's and in conjunction with the clear and prominent identification of her name and picture support a finding of a good-faith, non-trademark use.

### 3) *Repetition and Commercial Theme*

Mr. Sterne's conclusion that the repetitious use of PEI's terms creates a "commercial theme" of the "Playboy" or "Playmate" terms which is likely to confuse consumers is unsupported by the facts he puts forth. That the visible terms "Playboy" and "Playmate" in the title banner and the subject headings along the left-hand side of the site create a repetitive use of the Playboy and Playmate terms is, without more, irrelevant. Plaintiff has not asserted that the repeated use of "Playboy" and "Playmate" in the *subject headings* along the left-hand side of the homepage is anything other than a descriptive and/or editorial use of these terms. In fact, the use of these terms in her subject headings, "Playboy vs. Welles: Playboy Sues Playmate," "Autobiography: Learn More About My Playboy Days," and "Films & Videos/Magazines: Playboy Appearances and More," merely describe the contents of those web pages. Plaintiff's witness, James Sterne, also agreed:

"Welles' non-commercial or *editorial* uses of the Playboy Marks are...[for example] her 'Autobiography' page (describing her past association with PEI)...[and] her 'Films & Videos/Magazines' page (listing her film roles and appearances in PEI publications)." Sterne Decl., ¶ 12 (emphasis added). Plaintiff has not cited one authority, nor is the court aware of any, where the repetitive use, without more, of a descriptive and/or editorial term creates a likelihood of confusion, reveals bad faith or an intent to imply sponsorship, or otherwise places into dispute a defendant's fair use.

Moreover, the holding in *Cosmetically Sealed* affirms that there is no legal impediment to use a contested term or mark as a "commercial theme" so long as it is used fairly to describe the defendant's goods. In *Cosmetically Sealed*, discussed *supra*, the Second Circuit affirmed the district court's grant of summary judgment of the plaintiff's trademark infringement and unfair competition claims, notwithstanding the defendant's use of "Seal it with a Kiss!!" (a variation of Plaintiff's trademark, "Sealed With a Kiss") as a commercial theme in its promotional display of its own lipstick products. The court in *Cosmetically Sealed* court stated that the district court ruled that the use of the challenged phrase was not a use as a "mark to identify its Color Splash lipsticks" with the plaintiff's product, but rather was a use of the words in their ordinary meaning, in "their 'descriptive sense'—to describe an action that the sellers hope consumers will take, using their product." *Cosmetically Sealed*, 125 F.3d at 30. Similarly, in this case, even if Ms. Welles use of PEI's terms amounts to a repetitious "commercial theme," the court finds that her use is a fair use of "Playmate of the Year 1981," "Playboy Playmate of the Year 1981," and "PMOY '81" for these terms *describe* her and her goods and services, and they are *not* used to identify her goods with PEI or to identify PEI as the source.

### 4) Prominence [12]

Despite Plaintiff's contention that Ms. Welles' use of the PEI trademarked terms in the visual title, watermarks, and advertising banners are "prominent," Plaintiff provides little in the way of supporting facts to ground its allegation of prominence. In particular, the court finds problematic Plaintiff's failure to establish the "prominence" of the "PMOY" trademark—in either sense of the word prominent as "distinctly manifest to the senses," or "notable, leading, or eminent." Webster's Third New International Dictionary, p.1815 (1976). In contrast to Plaintiff's evidence of (1) the registration of the terms "Playboy" and "Playmate of the Year;" and (ii) the trademark use of those terms for a substantial period of time, Plaintiff fails to provide evidence, with respect to "PMOY," of either the registration or of the prolonged or recognized use of "PMOY" as an abbreviation for the designation, "Playmate of the Year." Plaintiff has not brought to the court's attention anything in its voluminous exhibits which indicates the registration of "PMOY" or its recognized use. In fact, Defendant has pointed to uncontroverted evidence of Plaintiff's lack of registration of "PMOY." See Decl. of Susan O'Keefe Head, Defense Counsel's Paralegal, Ex. 2; see also Decl. of Martha Lindeman, PEI Senior Vice-President of Investor Relations and Corporate Communications, at 3, ¶ 3, and Ex. B. Consequently, the court declines to assume that the "PMOY" term is "prominent" in the sense of "notable, leading, or eminent." Furthermore, the court fails to see—and Plaintiff fails to explain—how a watermark is physically "prominent," especially in light of the fact that watermarks are usually located in the background and not the foreground of a page. In fact, Plaintiff's witness James Sterne's reference to the watermarks as "a decorative logo repeating in the *background* of the homepage," Sterne Decl., ¶ 10 (emphasis added), merely affirms the court's befuddlement at the oxymoronic meaning in the description of a watermark in the "background" as "prominent."

However, in spite of Plaintiff's lack of substantiation of its claim of "prominence" to describe the use of PEI terms in Ms. Welles' website, emphasis itself, without more, is not inconsistent with a finding of fair use and has never, in the court's knowledge, been held to bar a fair use defense. Although an infringing use can be evidenced by the employment of a challenged term as an "attention-getting symbol," the emphasis of a descriptive term on a label, packaging, or advertising does not necessarily mean that the term is being used in a trademark sense. *See* 1 J. McCarthy, Trademarks and Unfair Competition, § 11.49, at 94.1 (1999) (*citing Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. 477, 486 (S.D.N.Y.1983).) Surely, it would render the fair use defense meaningless if a defendant were permitted to make a descriptive use of a mark as long as its use of the mark is not "attention-getting" or not "emphasized" in the title or package. As the district court in *Eli Lilly & Co.* recognized: "Virtually every aspect of a product's trade dress is *intended* to catch the eye of the purchaser." *Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. at 486 (empha-

---

**12.** Throughout its opposition and supporting papers, Plaintiff does not explain what it means by use of the word "prominent." The court assumes that Plaintiff is referring to physical prominence or emphasis, in the sense of "standing out or projecting beyond a surface or line, appearing in high relief, or distinctly manifest to the senses," rather than in the sense of "notable, leading, or eminent." Webster's Third New International Dictionary, p.1815 (1976). Since Plaintiff provides evidence of the registration for the terms "Playboy" and "Playmate of the Year" and trademark use of those terms for a substantial period of time, the court will assume, but not decide, for purposes of the motion for summary judgment that Plaintiff's marks, at least for "Playboy" and "Playmate of the Year," are "notable" or famous and incontestable under 15 U.S.C. § 1065 (1999). In contrast, since Plaintiff fails to provide evidence of either the registration or the prolonged use of the abbreviation, "PMOY," the court declines to assume that the "PMOY" term is "prominent" in the sense of "notable, leading, or eminent."

sis added). The court continued, "[u]nless attention is drawn to the particular word or term as being indicative of *source* of origin of that product, the term is *not* being used as a trademark." *Id.* As an appropriate analogy which the court finds equally apropos here, the court in *Eli Lilly & Co.* discussed the case of *Schmid Laboratories v. Youngs Drug Products Corp.*, 482 F.Supp. 14, 20–21 (D.N.J.1979) in which the *Schmid* court noted, "[W]hatever attention is drawn to 'RIBBED' serves only to inform the prospective purchaser what type of condom is contained within, not whose product it is... It denotes the difference between this particular type of condom and...several others..." *Id.* Likewise in this case, the court finds that any *emphasis* on the PEI trademarked terms in the visual title, watermarks, and advertising banners in Ms. Welles' website serves only to inform the consumer "what type of [product] is contained within" (i.e., who Ms. Welles' is and what her products and services are likely to be), not whose product it is in the sense of the "source" of the goods.

*Special Allegations Regarding the Advertising Banners*

■■■ As briefly mentioned in section III(A)(1)(a)(iii), *supra*, of this order, Plaintiff makes three specific contentions regarding the use of the advertising banners: (1) Anyone can "grab" these banners from defendant's website, and by doing so, include PEI's trademarks on the face of their website and in the source code; (2) Defendant's motivation for these banners is to attract click through traffic from other adult websites and increase her ranking among search engines that rank, in part, on the basis of a number of links to a website; and (3) An internet user who clicks through to defendant's website by clicking on the advertising banner on a third party website will likely know nothing about Ms. Welles' site other than the references on the banner—adult entertainment, the PEI trademark, and Ms. Welles' identification as a Playmate. *See* Opposition, at 7–8.

Even assuming as true each of these contentions, none of these factors warrant a finding of a non-trademark use of the terms "Playboy Playmate of the Year 1981" or "Playmate of the Year 1981" by Ms. Welles. The fact that anyone else can reproduce Ms. Welles' advertising banner, with her permission, does not transform Ms. Welles' use of the terms "Playboy Playmate of the Year 1981" or "Playmate of the Year 1981" to a trademark use or a use that is other than a nominative, fair use of those terms. *See* discussion *supra*, section III(A)(1)(a)(2)(I). Since Plaintiff does not allege any facts which indicate that third party users are doing anything other than reproducing or "grabbing" from Defendant's site her advertising banners, the court fails to see how the placement of Ms. Welles' advertising banners on third party sites, without more, would convert what this court has otherwise found to be a fair, non-trademark use of PEI's terms in Ms. Welles' advertising banners into an infringing use. Moreover, no law is cited that would support this claim.

■■■ Plaintiff's second assertion, that Defendant's motivation for these banners is to "attract click through traffic from other adult websites and increase her ranking among search engines that rank, in part, on the basis of a number of links to a website," is equally irrelevant to Ms. Welles' fair use defense. Plaintiff offers as evidence a "Referring URLS" report which reveals that the Welles site does receive a significant amount of traffic from sites on which are posted banners or links that contain the Playboy marks. *See* Sterne Decl., Ex. E. Even assuming this is true,[13] the court fails to see how this fact

---

**13.** In her Reply, Defendant Welles points out that there is nothing in Exhibit E of James Sterne's Declaration which indicates any of the referring URL sites contain the advertisement banners at issue. *See* Reply, at 4. Defendant Welles states that the sole third party website cited by Mr. Sterne which contains the banners is the website "virginasses.com," as shown in Exhibit F of James Sterne's Declaration. Since the court finds that it is irrelevant whether Ms. Welles' site receives a significant amount of traffic from other sites

can support Plaintiff's conclusion that the "banner advertisements for the Welles' site confuses users." *Id.* at 12. It is undisputed that Ms. Welles' use of the "Playboy Playmate of the Year 1981" or "Playmate of the Year 1981" terms is a commercial use; it is therefore not surprising that she is motivated by a desire to increase her commercial popularity on the internet. She is legally permitted to do so, so long as she is not infringing upon PEI's trademarks by making a trademark use of the contested terms. As discussed previously in this order, Ms. Welles use in the advertising banners of the terms "Playmate of the Year 1981" and "Playboy Playmate of the Year '81" to truthfully identify herself and her services is a fair use. Given that Ms. Welles *is* the "Playmate of the Year 1981," there is no other way that Ms. Welles can fairly identify or describe herself and her services.

Finally, Plaintiff asserts that "an internet user who clicks through to defendant's website by clicking on the advertising banner on a third party website will likely know nothing about Ms. Welles' site other than the references on the banner—adult entertainment, the PEI trademark, and Ms. Welles' identification as a Playmate." Opposition, at 8. The court first notes that this statement is not factually accurate in the sense that in actuality the words "Playmate of the Year 1981" and "Playboy Playmate of the Year '81" appear, in smaller letters, directly below or above the name "Terri Welles" on the advertising banner, although these PEI *trademarked* terms do not necessarily appear in the style or dress of a PEI trademark. Plaintiff has not asserted that Ms. Welles is using the PEI bunny logo or that the fonts for the contested terms are the same or similar as the fonts used in PEI's trademarks. In fact, Plaintiff presents absolutely no evidence that there is any indication that PEI is sponsoring the website. Ms. Welles' use of the terms "Playboy Playmate of the Year 1981" or "Playmate

of the Year 1981" in her advertising banners mirrors her use of these terms in the visual title of her homepage, with the exception of slight changes in the placement, font, size, and location. These banners are like mini-versions of her visual title or masthead in that they contain: (1) the lettering of the name "Terri Welles" in letters which are *larger* than the lettering of the designation, "Playmate of the Year 1981" or "Playboy Playmate of the Year 1981" and (2) a sole picture of the semi-nude Terri Welles. Like the visual title, the undisputed facts regarding and surrounding Ms. Welles' stylization and lettering of PEI terms in the advertising banners do not indicate a likelihood of confusion as to the source of the goods: Terri Welles. Thus, the court cannot say that Ms. Welles took more than what was necessary to merely identify or describe herself or her goods. *Cf. Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 758 (9th Cir.1978) (taking "more than was necessary" can defeat copyright fair use defense). Accordingly, the court finds that Plaintiff's specific allegations regarding Defendant's use of PEI trademarked terms in the advertising banners do not create a dispute of material fact as to Ms. Welles' non-trademark, fair use of those terms.

### The Non–Paradigmatic Fair Use Case: The New Kids Standard

■ As stated previously in section III(A)(1)(a)(2)(iii), *supra*, of this order, the governing law in this circuit regarding the classic fair use case is that a junior user's use should be deemed a fair, non-trademark use only if it is non-confusing. *See New Kids*, 971 F.2d at 308; *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985). In *New Kids*, however, the Ninth Circuit articulated a different kind of fair use: "Such a nominative use of a mark—where the only word reasonably available to·describe a particu-

displaying her advertising banners, the court need not decide whether Defendant's or

Plaintiff's statement is an accurate assessment of the facts.

lar thing is pressed into service—lies outside the strictures of trademark law" because "it does not implicate the source-identification function that is the purpose of trademark" and because it "does not imply sponsorship or endorsement by the trademark holder." *See New Kids*, 971 F.2d at 308. In such non-paradigmatic cases of "nominative use", the court held that a commercial defendant is entitled to a nominative fair use defense provided it meets the following three requirements: (1) the product or service in question must be one not readily identifiable without use of the trademark; (2) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and (3) the defendant must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. *See id.* Under the *New Kids* standard, a court does not reach the question of likelihood of confusion, apart from any analysis of a likelihood of confusion that is implied in the third *New Kids* prong. *See Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1143 (C.D.Cal.1998).

■ This court has previously discussed reasons why Ms. Welles' use of PEI terms in her website constitutes a fair use under the Lanham Act § 33(b)(4), i.e., why her descriptive use was fair and in good faith and was used only to describe her goods and services in a non-trademark manner. *See* 15 U.S.C. § 1115(b)(4) (1999). The court, however, additionally holds that Ms. Welles' use of the words "Playmate of the Year 1981" in her title on her homepage, "PMOY '81" in the watermarks, and "Playboy Playmate of the Year 1981" and "Playmate of the Year 1981" in her advertising banners falls within the non-paradigmatic line of cases established under *New Kids*. All three of the *New Kids* requirements have been met. As discussed previously in this order, 1) Ms. Welles has no viable alternative to the use of the term, "Playmate of the Year 1981," or "PMOY '81," 2) she references the contested terms only to the extent necessary to identify herself and doesn't use the dis-

tinctive Bunny logo or anything else that isn't needed to make the website intelligible and identifiable to consumers, and 3) she does nothing to suggest or imply sponsorship or endorsement of her website by PEI. On the contrary, she has disclaimers on her web pages and prominently displays as one of her subject headings, "Playboy vs. Welles: Playboy Sues Playmate." Moreover, she has links to and references about articles regarding the litigation on her website, and sometimes makes critical, albeit editorial, comments about Playboy. As the court stated in *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, 1997 WL 811770, *4 (N.D.Cal.1997), the court "would find incredible any argument to the contrary [of the finding of no sponsorship] given the website's disparagement" of PEI. The court finds that there is no genuine dispute of material fact as to Ms. Welles' nominative fair use of the PEI contested terms in the visual title, watermarks, or advertising banners of her website. Accordingly, the court finds that Defendant Welles has established a fair use defense under the *New Kids* standard for her use of the words "Playmate of the Year 1981" in her title on her homepage, "PMOY '81" in the watermarks, and "Playboy Playmate of the Year 1981" and "Playmate of the Year 1981" in her advertising banners. Summary judgment for Ms. Welles is proper as to all Plaintiff's trademark claims with respect to the visible portion of her website.

### (3) *Conclusion*

Viewing the facts and evidence in the light most favorable to Plaintiff, the court finds as a matter of law that Ms. Welles' has made a fair use of the terms "Playboy Playmate of the Year 1981," "Playmate of the Year 1981," and "PMOY '81" to describe and identify herself and her goods in the visual title, watermarks, and advertising banners on her website. Accordingly, granting of summary judgment is proper as to as to all Plaintiff's trademark claims, in Counts I through VII of the Second Amended Complaint, against De-

fendant Welles with respect to the use of use of the terms "Playboy Playmate of the Year 1981," "Playmate of the Year 1981," and "PMOY '81"in the visual title, watermarks, and advertising banners on her website.

### (b) *HTML Source Code: The Non–Visible Title, Meta Code Description, and Meta Tag Keywords*

#### (1) *Factual and Technical Background*

The HTML source code is the coding that is used for construction of a website's pages. All visible text that a user sees when viewing a web page is contained in the HTML source code. The HTML coding language also allows non-visible information about a web page to be recorded in the source code. Plaintiff alleges that Ms. Welles' use of its trademarks, "Playboy," "Playmate," and "Playmate of the Year" in the HTML source code of her website constitutes an infringing and diluting trademark use of its marks. The domain name of Ms. Welles' site is "www.terri-welles.com." The HTML code for the title of Ms. Welles' site currently reads, "Terri Welles Erotica." The description of Ms. Welles' site as it appears in the meta code is "Playboy Playmate of the Year 1981 Terri Welles website featuring erotic nude photos, semi-nude photos, softcore and exclusive Members Club." *See* Opposition, at 8 and Ex. E. The metatag keywords on Ms. Welles' website reads, "terri, welles, playmate, playboy, model, models, semi-nudity, naked, breast, breasts, tit, tits, nipple, nipples, ass, butt." *See id.* at Ex. E.

The Internet is an international, complex network connecting millions of individual computer networks and computers. Although the Internet is widely known, as the "World Wide Web," for its almost endless capacity for presenting and disseminating information, the Internet supports many other forms of communication in addition to the Web, such as e-mail, bulletin board services, news groups, and numerous others. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F.Supp. at 951. Because of its capabilities, "[f]or commercial users, the Web is the most important part of the Internet" and "has become a popular medium for advertising and for direct consumer access to goods and services." *Id.* However, simultaneously, the Web remains an important medium of *non-commercial* communications and has made it easier for individuals and small groups or organizations to publish information to the general public as well as obtain information. *See id.*

The following technical facts regarding how the Internet and Web operate are undisputed by the parties. Internet communication is premised on the use of domain names to locate specific computers and networks in cyberspace. A link, or hyperlink, is an image or section of text referring to another document on the Web and is in essence a system which takes people between websites or web pages. *See* Decl. of Danny Sullivan ("Sullivan Decl."), Defendant Welles' Expert Witness, ¶ 9, at 4. Web pages display words and pictures about a particular topic, in much the same way that a printed page from a magazine or a book might display words and pictures. *See id.* at ¶ 4. And just as a magazine or book is a collection of interconnected pages unified by one or more subjects or themes, a website is a collection of interconnected web pages with one or more common themes or topics. *See id.*

Users searching for a specific website can either type it into a web browser to access the site directly, or they can utilize a "search engine" available on the Web to search for a specific website by keywords and phrases. Listings or results are the end product of a search. There are two basic types of search engines: human powered and web-crawler. Human-powered search engines produce human-compiled listings which have been approved and categorized by human search engine editors, much like how a librarian might catalog books in the library. *See id.* at ¶ 13. Changes to a website's meta tag descriptors, keywords, or HTML title have no impact on human-compiled listings or

search results unless a human editor decides to follow or endorse these changes. *See id.* However, due to the inordinate amount of websites, human editors cannot classify everything, and consequently, some search engines are more reliant on the web-crawler than the human-powered engines, or human editors. *See id.* at ¶ 16.

Web crawlers "read" individual web pages by reading much of the text in the HTML source code and store in cyberspace memory the text they find on each page. *See id.* at ¶ 15. In addition to providing a listing of search results which was initiated by the consumer's typing of keywords or phrases into a browser, search engines enable consumers to sort through their listings by ranking pages so that the pages which best match their relevancy criteria are listed first, then continuing in chronological order. *See id.* at ¶ 17. The criteria or algorithm used by search engines to rank search results in response to a particular search query varies among different search engines and even within search engines, as these formula continue to change from time to time. *See id.* at ¶¶ 17–24; *see also* Sterne Decl., ¶ 31, at 11. These criteria or algorithms are a combination of many various factors, including but not limited to, the frequency of words on a page, the location of words, the HTML title, and metatags (meta descriptors and meta keywords). *See* Sullivan Decl., at ¶¶ 17–24. The title tag is text that is used as the title of a web page in the listings of a crawler-based search engine. *See id.* at ¶ 20. Metatags are mostly used to provide additional information about a web page and are not ordinarily viewed by users. *See id.* at ¶ 21. The meta descriptors allows web page authors to state the exact description they would like to have for their web pages as listed in the search results of a web crawler search engine, and the meta keyword tags allow page authors, at least in theory, to identify or add words to their pages in order to better define or accurately relate the contents of the page for the web crawler search engine. *See id.* at ¶ 23.

## (2) *Analysis*

■ Plaintiff relies on *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036 (9th Cir. 1999), to support its contention in this case that Defendant's use of PEI's trademarks in the metatags in her website infringes on its trademark by causing "likelihood of confusion...shown on the basis of initial interest confusion." Opposition, at 12. The metatag use at issue is the use of the terms "Playboy Playmate of the Year 1981" in the meta code descriptor and the terms "playboy" [14] and "playmate" in the metatag keywords. The court will simultaneously refer to the use of these terms in the metatags as "the use of PEI terms." Although Plaintiff is correct in citing *Brookfield* for the proposition that "likelihood of confusion can be shown on the basis of initial interest confusion," Plaintiff's reliance on *Brookfield* is misplaced as applied to Ms. Welles' case.

In *Brookfield,* the Ninth Circuit has noted that "the few courts to consider whether the use of another's trademark in one's metatags constitutes trademark infringement have ruled in the affirmative." *Brookfield Communications, Inc.,* 174 F.3d at 1064 (discussing *Playboy Enterprises, Inc. v. Asiafocus Int'l, Inc.,* 1998 WL 724000, at *3, * 6–*7 (E.D.Va.Apr.10, 1998), *Playboy Enterprises, Inc. v. Calvin Designer Label,* 985 F.Supp. 1220, 1221 (N.D.Cal.1997), and *Niton Corp. v. Radiation Monitoring Devices, Inc.,* 27 F.Supp.2d 102, 104 (D.Mass.1998)). None of the cases which *Brookfield* discusses, however, involved the fair use defense or a use of trademarks in the metatags which accurately and fairly describe the contents

14. Although the terms "playboy" and "playmate" are not capitalized as used in Ms. Welles' metatags, the court, as does the parties, makes no distinction between a capitalized and non-capitalized use of these terms in the metatags. Therefore, the court may use the capitalized and non-capitalized version throughout this section of its order interchangeably.

of the web page or website. And although *Brookfield* concerned the use of the plaintiff's trademarked terms in the metatags of the defendant's website, it did *not* involve the use of the fair use defense within the metatags context. In other words, *Brookfield* is distinguishable from the present case since here *both* the (1) fair use defense; *and* (2) the use of trademarks in the metatags are involved, a situation which is unlike the scenario before the *Brookfield* court.

The court in *Brookfield*, however, did not entirely overlook the possibility of such a situation as Ms. Welles finds herself in here. In *Brookfield*, the Ninth Circuit held that the defendant video store chain's use of Plaintiff's trademark, "MovieBuff," would create a likelihood of confusion even though the defendant had a protected trademark in the words, "The Movie Buff's Movie Store." In so holding, the court stated that "we are not in any way restricting [the defendant's] right to use terms in a manner which would constitute fair use under the Lanham Act." *Brookfield Communications, Inc.*, 174 F.3d at 1065 (*citing New Kids*, 971 F.2d at 306–309). Coincidentally, the court cited an earlier opinion in this case denying preliminary injunction as an example that a defendant's use of trademarks in a website's metatags in a descriptive manner can be a permissible, non-infringing fair use. *See id.* at 1065–66 (*citing Playboy Enterprises, Inc. v. Welles*, 7 F.Supp.2d 1098, 1100 (S.D.Cal.1998)). Thus, the court finds that insofar as Plaintiff relies on *Brookfield* to support its position, *Brookfield* is distinguishable since the defendant's use in *Brookfield* of the word "MovieBuff" was found *not* to have been a descriptive use (although the court noted that the term "Movie Buff" (*with* a single space) *is* a descriptive term and that the difference was pivotal). *See id.* at 1066.

Although *Brookfield* is distinguishable in the above-described manner, the court must nevertheless address the issue of whether there is a likelihood of confusion, the keystone of whether a use constitutes trademark infringement or unfair competi-

tion. *See Lindy Pen Co.*, 725 F.2d at 1243. As the court stated earlier in section III(A)(1)(a)(2)(iii) of this order, the governing law in the Ninth Circuit is that in order to constitute a non-trademark, "fair use," the use cannot amount to a trademark infringement or unfair competition. *See id.* at 1248. As this court has also noted on several prior occasions, however, this case is not a standard trademark case and does not lend itself to the systematic application of the eight factors in *Sleekcraft*. This particular difficulty was acknowledged by the *Brookfield* court, wherein that court noted that "the traditional eight-factor test is not well-suited for analyzing the metatags issue." *Id.* at 1062, fn. 24. The reasons the *Brookfield* court cited for distinguishing "metatags" cases from other trademark cases, *even* those involving closely-related issues of trademark infringement on the internet, such as in the case of domain names, concerned the special nature of confusion in the context of Internet searches via Internet search engines. *See id.* at 1062. Specifically, the court noted that the results listings produced by a search engine after a web user's inputting of the contested trademark (e.g., "MovieBuff") is likely to include both the defendant's and the plaintiff's websites, and in reviewing such a list, the web user "will often be able to find the particular web site he is seeking." *Id.* In addition, the court noted that even if a web user clicks on the website belonging to the defendant, he will see that the domain name of the website he has selected is the defendant's domain name (e.g., "westcoastvideo.com"), not the plaintiff's, and that the initial web page will feature the defendant's, not the plaintiff's business name. *See id.* Consequently, the *Brookfield* court concluded that in the context of metatags, it is "difficult to say that a consumer is likely to be confused about whose site he has reached or to think that somehow [the plaintiff] sponsors [the defendant's] web site." *Id.* The *Brookfield* court's reasoning with respect to the inadequacy of the *Sleekcraft* analysis in the metatags

context is pertinent to this case; this court will therefore consider whether there is a likelihood of confusion in this case without attempting to justify its analysis under all of the *Sleekcraft* factors.[15]

Here, Defendant has used the terms "playboy," and "playmate" in the meta tag keywords and the term "Playboy Playmate of the Year 1981," in the meta code descriptor for her site so that those using search engines on the Web can find her website if they are looking for a Playboy Playmate. Plaintiff's only evidence regarding likelihood of confusion with respect to Defendant's use of PEI terms in her metatags (other than the evidence of prominence, repetition, location, commercial theme, etc. which was previously discussed and rejected in section III(A)(1)(a)(2) of this order) concerns the theory of initial interest confusion: a confusion of "consumer attention, even though no actual sale is finally completed as a result of the confusion" and even though, once reaching the site, the consumer is not actually confused or is not likely to be confused as to the correct sponsor of the site to which he or she was led initially. *See Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1405 (9th Cir. 1997), *cert. denied,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997). Plaintiff presents some circumstantial evidence, and both parties' experts agree, that an "appreciable number" of people who plug in one of Plaintiff's trademark terms into a web browser search engine are "looking for Playboy's official site." *See* Decl. of Ross Hyslop (Hyslop Decl.), Plaintiff's co-counsel, ¶ 3, at 2, and Ex. B ("Deposition of Danny Sullivan, Defendant's Expert Witness") ("Sullivan Deposition"). This indicates that there is at least a showing of some "initial interest confusion."

*Dr. Seuss,* like *Brookfield,* held that initial interest confusion is actionable under the Lanham Act, *not* that a finding of

initial interest confusion compelled a finding of trademark infringement or barred a finding of fair use. In other words, both cases held that a finding of initial interest confusion *can* be a basis for a finding of likelihood of confusion, but the presence of initial interest confusion does not necessarily support a finding of likelihood of confusion. To the contrary, the *Brookfield* court stated that their holding did not "in any way restrict[ ] [the defendant's] right to use terms in a manner which would constitute fair use under the Lanham Act." *Id.* at 1065.

Other courts cited by the *Brookfield* court which acknowledged initial interest confusion as being actionable under the Lanham Act have indicated that other factors are relevant in a finding of a confusing trademark use, or infringement. Among these are: (1) evidence of the initial interest confusion as being "damaging and wrongful," *Koppers Co. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 844 (W.D.Pa. 1981); (2) evidence that confusion between two products "will mistakenly lead the consumer to believe there is some connection between the two and therefore develop an interest in the [defendant's] line that it would otherwise not have," *Kompan A.S. v. Park Structures, Inc.,* 890 F.Supp. 1167, 1180 (N.D.N.Y.1995); or (3) evidence that the "situation offers an opportunity for sale not otherwise available by enabling defendant to interest prospective customers by confusion with the plaintiff's product." *Sara Lee Corp. v. Kayser–Roth Corp.,* 1992 WL 436279, at *24 (W.D.N.C. Dec.1, 1992). In the present case, Plaintiff has failed to present any facts indicating 1) any initial interest confusion was "damaging and wrongful"; 2) anyone believes or is likely to believe there is a connection between PEI's and Ms. Welles' site; 3) Ms. Welles received "opportunit[ies] for sale not otherwise available" by confusing web

15. The court also notes as an aside that the *Brookfield* has stated that even within the parameters of a *Sleekcraft* inquiry, a court's inquiry need not be limited to the eight factors and that non-listed variables may often be quite important. See *Brookfield Communications, Inc.,* 174 F.3d at 1054. Moreover, a court must be "acutely aware of excessive rigidity when applying the law in the Internet context." *Id.*

users; or 4) any of Ms. Welles' actual customers were in the "appreciable number," or majority of people who when plugging in one of Plaintiff's trademark terms into a web browser search engine, was "looking for Playboy's official site." *See* Hyslop Decl.¶ 3, at 2, and Ex. B ("Sullivan Deposition"). Furthermore, there is no evidence in this case that Ms. Welles has intended to divert Plaintiff's customers to her website by trading on PEI's goodwill. *See supra,* section III(A)(1)(a)(2)(ii) of this order. This intent is relevant since the court in *Brookfield* stated that "in *Dr. Seuss,* the Ninth Circuit explicitly recognized that the use of another's trademark in a manner *calculated* 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, *may* be still an infringement.'" *Brookfield Communications, Inc.,* 174 F.3d at 1062 (citing *Dr. Seuss,* 109 F.3d at 1405) (emphasis added).

The Ninth Circuit warned in *Brookfield:* "We must be acutely aware of excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach." *Id.* at 1054. As this court previously stated, the Internet is an international, complex network connecting millions of individual computer networks and computers, thus earning the denomination of "information superhighway." The Internet is constantly evolving, as is the new field of cyberspace law. The novelty of this area, especially in the area of trademark infringement, is evidenced by the few courts that have considered the precise issues that are raised before the court in this case. In rendering an analysis which is flexible and reflective of "emerging technologies," this court is also mindful that it must not lose sight of either common sense or the important, foundational and underlying principles of trademark law. Finding that Ms. Welles' use of PEI's trademarked terms in the metatags of her website is a fair use comports with the fact web users must utilize identifying words to find their intended site. Not all web searches utilizing the words "Playboy," "Playmate," and "Playboy Playmate

of the Year 1981" are intended to find "Playboy" goods or the official "Playboy" site. Plaintiff has not addressed the fact that Ms. Welles' fame and recognition derive from her popularity as a Playboy model and Playmate of the Year. If a consumer cannot remember her name, the logical way to find her site on the web is by using key words that identify her source of recognition to the public: "Playboy Playmate of the Year 1981," "Playboy," and "Playmate." These are the words to which PEI objects. PEI, however, fails to suggest alternative, non-offending words to locate Ms. Welles' website. The World Wide Web is a commercial marketplace and a free speech marketplace. To give consumers access to it, the court must also be careful to give consumers the freedom to locate desired sites while protecting the integrity of trademarks and trade names. The court stresses that the underlying or foundational purpose of trademark protection is *not* to create a property interest in *all* words used in a commercial context, but rather "[t]he policies of free competition and free use of language dictate that trademark law cannot forbid the commercial use of terms in their descriptive sense." 1 J. McCarthy, Trademarks and Unfair Competition, § 11.45, at 82 (1999). As Justice Holmes in *Prestonettes v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924), put more eloquently, "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth."

#### (3) *Conclusion*

In summary, the court finds in this case that Plaintiff's presentation of evidence regarding initial interest confusion is insufficient under *Dr. Seuss* and *Brookfield* to establish a material issue of fact as to whether Ms. Welles' use of PEI terms in the metatags of her website was a trademark infringement or amounted to unfair competition under the Lanham Act. Furthermore, in light of the fact that there is no evidence of an intent by Ms. Welles to

trade upon the goodwill of Plaintiff's marks by falsely implying sponsorship by or affiliation with PEI, and there is no evidence of actual consumer confusion or likelihood of confusion regarding any implied PEI endorsement, and in light of the court's discussion in section III(A)(1)(a)(2), *supra*, of this order, regarding Ms. Welles' nominative, fair use of the terms to describe her goods and services, the court holds that Plaintiff has failed to raise a material issue of fact concerning the fair use of PEI terms in her metatags. Accordingly, the court grants Defendant Welles' motion for summary judgment on all Plaintiff's trademark claims against her with respect to the use of the terms "Playboy," "Playmate," and "Playmate of the Year 1981," in the HTML source code of her website.

### 2. Counts III and VII: Trademark Dilution

 Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of . . . (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127 (1999). Under the Federal Trademark Dilution Act, a dilution claim is not actionable if there is a "[f]air use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark." 15 U.S.C. § 1125(c)(4)(A) (1999). Similarly, under California Business and Professions Code § 14335, a claim for dilution cannot lie where a person uses a mark "in an otherwise non-infringing manner, either on the person's own goods or services or to describe the person's own goods or services." Cal. Bus. & Prof.Code § 14335 (1999).

The court has found in this order that Ms. Welles' use of the terms "Playboy Playmate of the Year 1981," "Playmate of the Year 1981," and "PMOY '81" in her website constitute identification of herself: a nominative fair use. The use of those terms in the visible portion of her website and the terms, "Playboy Playmate of the Year 1981," "Playboy," and "Playmate," in the meta tags, allows web surfers and potential customers correctly to identify her site and locate her services. In cases where the trademarked term must be used to identify the individual or a good, infringement and dilution laws do not apply. *See New Kids*, 971 F.2d at 306. Since the court has found that Defendant is entitled to the "fair use" defense pursuant to the Lanham Act, 15 U.S.C. § 1115(b)(4), as to Plaintiff's trademark infringement and unfair competition claims, the court also finds that Defendant is entitled to the "fair use" defense on Plaintiff's federal dilution claims under the Lanham Act, 15 U.S.C. § 1125(c)(4)(A). In addition, since a common law fair use defense incorporates the statutory elements of Lanham Act § 33(b)(4), this court's finding as a matter of law of a fair use defense as to Plaintiff's trademark infringement, dilution, and unfair competition claims under the Lanham Act also applies to Plaintiff's dilution claims under California state and common law. *See Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984). Accordingly, the court finds as a matter of law that Defendant Welles' use of the terms "Playboy Playmate of the Year 1981," "Playmate of the Year 1981," "PMOY '81," "Playmate," and "Playboy" does not dilute PEI's trademarks.

### 3. Count VIII: Breach of Contract Claim

 The following facts are undisputed. The contract at issue was executed in April 1981 between PEI and Pippi, Inc. Pippi, Inc. is a defunct corporation which dissolved in July 1984. *See* Decl. of Terri Welles, ¶ 39–40. Pippi, Inc. was incorporated in March 1981, with the assistance of Vicki McCarty, a PEI attorney, who served as the secretary of Pippi, Inc. *See id.* Ms. Welles was selected by PEI as "Playmate of the Year" for 1981. The "contract" is in essence both a congratulatory letter to Ms. Welles for her selection as "Playmate of the Year" for 1981 as well as a business agreement with respect to

the terms, conditions, and obligations of the two signatory parties: PEI (through it senior vice president) and Pippi, Inc. (through Terri Welles). In return for the "services of Ms. Welles as 'Playmate of the Year,' on an independent contractor basis," Pippi, Inc. was promised cash prizes and gifts. Decl. of Terri Welles, Ex. 20, at 129. The letter is addressed to Steven Blalock, the incorporator of Pippi, Inc. and the designated agent for service of process for Pippi, Inc. The relevant part of the contract states, "Any non-Playboy use of [Ms. Welles] name with the designation 'Playmate of the Year' is subject to Playboy's prior written approval." *Id.; see also* Motion, at 22.

In its Complaint, Plaintiff seeks to have this court disregard the corporate entity, Pippi, Inc., which signed the contract at issue and hold Ms. Welles personally liable for any breach of contract resulting from Ms. Welles' unauthorized use of PEI's marks in her website. More specifically, Plaintiff alleges that since Ms. Welles is the alter ego of Pippi, Inc., she should be held individually bound by the contract at issue, even though the contract was formed between Pippi, Inc. as a corporate entity, and PEI, *not* between Ms. Welles individually and PEI. Plaintiff interprets the April 1981 contract signed by Pippi, Inc. as prohibiting the commercial use by Ms. Welles individually, or in any representative capacity, of PEI's marks without its written consent. Therefore, according to Plaintiff, Ms. Welles' use of PEI's marks in her website is a breach of the contract she signed on behalf of Pippi, Inc. in April 1981. In sum, Plaintiff's alleges the following: (1) The April 1981 contract signed by Pippi, Inc. prohibits the commercial use by Ms. Welles individually, or in any representative capacity, of PEI's marks without its written consent; (2) Since Ms. Welles does not have written consent to use PEI's marks in her website, the use of PEI's marks in her website is a breach of the April 1981 contract; (3) Ms.

Welles is the alter ego of Pippi, Inc. and Pippi, Inc.'s corporate entity should be disregarded with respect to the signing of the April 1981 contract; and (4) Ms. Welles should be held personally liable for any breach of contract by her individually or in a representative capacity.

After reviewing all the evidence, the court holds that Plaintiff has failed to raise a material issue of fact that (1) Pippi, Inc. is liable since it was dissolved; or (2) that the "corporate veil" of Pippi, Inc. should be "pierced." The dispositive case is *Penasquitos, Inc. v. Superior Court,* 53 Cal.3d 1180, 812 P.2d 154, 283 Cal.Rptr. 135 (1991). In *Penasquitos,* the California Supreme Court held that under California Corporations Code § 2010, a corporation may be sued for actions taken after the corporation has dissolved. In *Penasquitos,* the court held that post-dissolution claims against dissolved corporations can be brought with respect to *pre*-dissolution, *not* post-dissolution,[16] activities. "There is no legal barrier to a suit against a dissolved corporation itself for injury or damage that is caused by the corporation's *predissolution* activities…[that are] discovered after the dissolution." *Id.* at 1194, 283 Cal.Rptr. 135, 812 P.2d 154 (emphasis added).

In the opinion, the court reasoned that a dissolved corporation may be sued for an indefinite period of time post-dissolution because a "corporation's dissolution is best understood not as its death, but merely as its retirement from active business." *Id.* at 1190, 283 Cal.Rptr. 135, 812 P.2d 154. In so reasoning, the court noted that "the only purpose" of former California Civil Code § 399, a predecessor of California Corporations Code § 2010, was to "stop further doing of business as a going concern, and limit corporate activities to winding up." *Id.* In other words, after dissolution, the corporation does *not* cease to exist as a legal entity for purposes of

---

**16.** The exception for post-dissolution claims for post-dissolution activities are those claims regarding wind-up activities. *Penasquitos,*

*Inc.,* 53 Cal.3d at 1190, 283 Cal.Rptr. 135, 812 P.2d 154 (Cal.1991); *see also* Cal. Corp. Code § 2010(a) (1991).

defending against lawsuits, but it does cease "for the purpose of continuing business except so far as necessary for the winding up thereof." Cal. Corp.Code § 2010(a) (1991). Since it is undisputed that Pippi, Inc. was dissolved and completed its winding up in 1984, any post-dissolution claims arising from Pippi, Inc.'s *post-dissolution* activity are barred under *Penasquitos*. *See Penasquitos*, 53 Cal.3d at 1194, 283 Cal.Rptr. 135, 812 P.2d 154. Even assuming *arguendo* Ms. Welles' present website activity could be construed as a breach of the April 1981 contract, Pippi, Inc. cannot be held liable for claims arising from such *post-dissolution* website activities because it no longer is a legal entity for purposes of "continuing business." *See* Cal. Corp.Code § 2010(a) (1991). Pippi, Inc. "retired" from active business in 1984, when it was dissolved, and after its dissolution, Pippi, Inc. was and is still not authorized to continue active business (which allegedly infringe PEI's trademarks) nor has Pippi, Inc. since 1984 been recognized under the law as an entity doing business. The claimed use by Ms. Welles of the terms Playboy, Playmate, and PMOY started in 1997, thirteen years after Pippi's dissolution.

Moreover, Ms. Welles cannot be held personally liable for the alleged post-dissolution activity of Pippi, Inc. because Plaintiff has failed to raise a material issue of fact justifying piercing Pippi's corporate veil. Plaintiff alleges that (1) Ms. Welles owned and was the president and sole employee of Pippi; (2) the contract was solely for her benefit; (3) she was the corporation's only asset; (4) Pippi's office was Ms. Welles' home; (5) the corporation's books and records (if there were any) were kept in Ms. Welles' home; (6) Ms. Welles was the only person that earned money on behalf of Pippi; and (7) Pippi was created solely for the tax advantages it might offer to Ms. Welles. *See* Opposition, at 21–22. Assuming all these allegations are true, Plaintiff still fails to raise a material issue of fact as to why Ms. Welles should be held liable under the alter ego theory.

The alter ego theory is an equitable doctrine based on California Civil Code 3528. *See Webber v. Inland Empire Investments*, 74 Cal.App.4th 884, 900, 88 Cal.Rptr.2d 594 (1999). Under the alter ego doctrine, "where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat *the corporation's acts* as if they were done by the persons actually controlling the corporation." *Id.* (emphasis added). Thus, a party asserting the doctrine must show two requirements: "(1) a unity of interest and ownership such that the separate personalities of the corporation and the individual no longer exist; and (2) that an inequitable result will follow if the acts are treated as those of the corporation alone." *Id.* at 899, 88 Cal.Rptr.2d 594. The California Supreme Court has stated that the corporate form will be disregarded only in narrowly circumscribed circumstances and only when the ends of justice so require. *See Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 702 P.2d 601 (1985).

In assessing whether Plaintiff has raised a material issue of fact as to whether Ms. Welles was the "alter ego" of Pippi, Inc., this court must find that Plaintiff has raised a material issue of fact as to *both* requirements in *Mesler v. Bragg Management Co.* as set forth above. Plaintiff's allegations, if taken as true, do not raise an issue of material fact as to the first requirement, that Ms. Welles and Pippi, Inc. had a "unity of interest and ownership such that the separate personalities of the corporation and the individual [may] no longer [have] exist[ed]." *Id.* Plaintiff puts forth no fact that suggest Ms. Welles did not respect the separate identity of the corporation. Plaintiff's allegations apply to any small corporation. Moreover, Plaintiff does not raise a material issue of fact as to the second requirement: Plaintiff's allegations, if taken as true, do not demonstrate that treating the acts as those

of the corporation alone would create an "inequitable result." Plaintiff puts forth no facts that suggest Ms. Welles used the corporate form to "perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Id.*

Plaintiff also alleges in its briefing papers that "Ms. Welles chose abruptly to dissolve the corporation while contractual obligations were in effect." Opposition, at 22. Although Plaintiff does not state what contractual obligations were in effect when Pippi, Inc. was dissolved, this fact is irrelevant unless Plaintiff can articulate any facts to show that the dissolution of the corporation while contractual obligations were in effect was fraudulent, circumvented a statute, or accomplished some other wrongful or inequitable purpose. *See Webber,* 74 Cal.App.4th at 900, 88 Cal. Rptr.2d 594. And Plaintiff puts forth no facts showing this dissolution was inequitable. In this case, Plaintiff does not claim that Ms. Welles "violated" the contractual obligations at issue until fifteen years after Pippi, Inc.'s dissolution. Since Plaintiff provides no such facts from which one could infer that Ms. Welles used Pippi, Inc. to "perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose," such that "a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation," *Webber v. Inland Empire Investments,* 74 Cal.App.4th at 900, 88 Cal. Rptr.2d 594, the court grants summary judgment to Defendant on the breach of contract claim.

In sum, Pippi, Inc. cannot be held liable for post-dissolution claims arising from post-dissolution activity. In addition, Ms. Welles cannot be held individually liable under the April 1981 contract on the alter ego theory since Plaintiff fails to present any facts creating a genuine issue as to whether Ms. Welles used Pippi, Inc. in order to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose. Accordingly, granting summary judgment is proper as to Plaintiff's claims regarding the breach of contract.

## B. PEI'S CLAIMS AGAINST MICHAEL MIHALKO

■ On October 18, 1999, Defendant Michael Mihalko filed a motion for partial summary judgment claiming the "innocent infringer" defense pursuant to 15 U.S.C. § 1114(2). Defendant Mihalko also filed a joinder in Defendant Welles' summary judgment motion. Plaintiff objects to Defendant Mihalko's joinder.

Plaintiff objects to the joinder on two grounds: (1) Joinder is procedurally improper since it cannot be determined what evidence was relied upon and what undisputed material facts support the Joinder, as required under Fed.R.Civ.P. 56(e); and (2) Since Defendant Mihalko contends that as webmaster, he merely followed the instructions of Ms. Welles with regards to changes in the website and since Ms. Welles contends that she was not responsible for or knowledgeable about the manipulation of the metatags on her website, Defendant Mihalko and Defendant Welles appear to have conflicting interests.

Since the court has found that as a matter of law Defendant Welles is entitled to a fair use defense with respect to Plaintiff's trademark-related claims, Defendant Mihalko cannot be held liable where there is no trademark infringement, counterfeiting, dilution, or unfair competition arising from Ms. Welles and her webmasters' internet activities under the Lanham Act 15 U.S.C. §§ 1114(1) and 1125(a) and (c), or under California state or common law. Thus, the court denies Plaintiff's objections to Defendant Mihalko's joinder as moot. The court grants summary judgment for Defendant Mihalko on all Plaintiff's claims against him.

## C. PEI'S CLAIMS AGAINST STEPHEN HUNTINGTON

On October 18, 1999, Defendant Stephen Huntington, the former webmaster of Ms. Welles' website, filed a joinder in both

Defendant Welles' and Defendant Mihalko's motions for summary judgment or summary adjudication of all eight counts in Plaintiff's Second Amended Complaint. Defendant Huntington did not file a separate motion or memorandum of points and authorities.

Plaintiff objects to the joinder on two grounds: (1) insofar as Defendant Mihalko alleges that he did not change the basic structure and text of Ms. Welles' website, Defendant Mihalko and Defendant Huntington have conflicting interests; and (2) Insofar as Defendant Mihalko's declaration implies that the webmaster merely follows the instructions of Ms. Welles with regards to changes in the website and insofar as Ms. Welles contends that she was not responsible for knowledgeable about the manipulation of the metatags on her website, Defendant Huntington and Defendant Welles appear to have conflicting interests.

Since the court has found that as a matter of law Defendant Welles is entitled to a fair use defense with respect to Plaintiff's trademark-related claims, Defendant Huntington cannot be held liable where there is no trademark infringement, counterfeiting, dilution, or unfair competition arising from Ms. Welles and her webmasters' internet activities under the Lanham Act 15 U.S.C. §§ 1114(1) and 1125(a) and (c), or under California state or common law. Therefore, the court denies Plaintiff's Objections to Defendant Huntington's joinder as moot. Defendant Huntington is granted summary on all Plaintiff's claims against him.

### D. EVIDENTIARY OBJECTIONS

Both Plaintiff and Defendant Welles raised a number of evidentiary objections. Because this court did not rely on or cite to any of the evidence to which Plaintiff raised evidentiary objections, Plaintiff's evidentiary objections are all **DENIED** as moot. Defendant Welles raised a number of evidentiary objections regarding the submission of Plaintiff's exhibits and declarations. Defendant Welles objects to Mr. Sterne's opinions as to alleged consumer confusion and likelihood of confusion and

consumer expectations as lacking foundation and speculative. The court overrules the objection. However, as previously discussed in this order, insofar as Mr. Sterne's conclusory statements render legal opinions regarding whether Ms. Welles' use of the contested terms is "descriptive," constitutes use as "Playboy [trade]marks," or will create a "likelihood of confusion," the court does not give them weight. *See United States v. Scop*, 846 F.2d at 139 (2d Cir.1988). Federal Rules of Evidence 702 and 704 were not intended to allow experts to offer opinions embodying legal conclusions. *See id.* Moreover, the opinions are unsupported. All other evidentiary objections raised by Defendant Welles with regards to Plaintiff's Expert Witness James Sterne's Declaration are **DENIED.** Because this court did not rely on or cite to any of the other evidence to which Defendant Welles raised evidentiary objections, Defendant Welles' remaining evidentiary objections are all **DENIED** as moot.

### IV. *CONCLUSION*

Based on the foregoing analysis, the court, hereby **GRANTS** Defendant Terri Welles,' Terri Welles, Inc, Pippi, Inc.'s, Defendant Mihalko's, and Defendant Huntington's Motion For Summary Judgement as to all Plaintiff's claims in Counts I through VIII of the Second Amended Complaint. The court also **DENIES** Plaintiff's evidentiary objections as moot. The court **DENIES** Defendant Welles' evidentiary objections to Plaintiff's Expert Witness James Sterne's Declaration and **DENIES** Defendant Welles' remaining evidentiary objections as moot.

**IT IS SO ORDERED.**